## MISSOURI ET AL. *v.* JENKINS ET AL.

No. 88–1150.   Argued October 30, 1989—Decided April 18, 1990

34

WHITE, J., delivered the opinion for a unanimous Court with respect to Parts I and II, and the opinion of the Court with respect to Parts III and IV, in which BRENNAN, MARSHALL, BLACKMUN, and STEVENS, JJ., joined. KENNEDY, J., filed an opinion concurring in part and concurring in the judgment, in which REHNQUIST, C. J., and O'CONNOR and SCALIA, JJ., joined, *post*. p. 58.

*H. Bartow Farr III* argued the cause for petitioners. With him on the briefs were *William Webster*, Attorney General of Missouri, *James B. Deutsch*, Deputy Attorney General, *Michael J. Fields*, Assistant Attorney General, and *David R. Boyd.*

*Allen R. Snyder* argued the cause for respondents. With him on the brief for respondents Kalima Jenkins et al. were *David S. Tatel, Walter A. Smith, Jr., Patricia A. Brannan, Shirley W. Keeler, Arthur A. Benson II, James S. Liebman, Julius L. Chambers, James M. Nabrit III, Theodore M. Shaw,* and *Norman J. Chachkin*. *Michael D. Gordon* and *Lawrence A. Poltrock* filed a brief for respondent American Federation of Teachers, Local 691.*

*Briefs of *amici curiae* urging reversal were filed for the State of New Mexico by *Hal Stratton*, Attorney General, *Randall W. Childress*, Deputy Attorney General, *Charles R. Peifer*, Chief Assistant Attorney General, and *Paul Farley*, Assistant Attorney General; for Jackson County, Missouri, by *John B. Williams* and *Russell D. Jacobson;* for the National Governors' Association et al. by *Benna Ruth Solomon, Joyce Holmes Benjamin,* and *Andrew D. Hurwitz;* and for Icelean Clark et al. by *Mark J. Bredemeier* and *Jerald L. Hill.*

*Peter S. Hendrixson* filed a brief for the Lawyers' Committee for Civil Rights Under Law as *amicus curiae* urging affirmance.

JUSTICE WHITE delivered the opinion of the Court.

The United States District Court for the Western District of Missouri imposed an increase in the property taxes levied by the Kansas City, Missouri, School District (KCMSD) to ensure funding for the desegregation of KCMSD's public schools. We granted certiorari to consider the State of Missouri's argument that the District Court lacked the power to raise local property taxes. For the reasons given below, we hold that the District Court abused its discretion in imposing the tax increase. We also hold, however, that the modifications of the District Court's order made by the Court of Appeals do satisfy equitable and constitutional principles governing the District Court's power.

I

In 1977, KCMSD and a group of KCMSD students filed a complaint alleging that the State of Missouri and surrounding school districts had operated a segregated public school system in the Kansas City metropolitan area.[1] The District Court realigned KCMSD as a party defendant, *School Dist. of Kansas City* v. *Missouri*, 460 F. Supp. 421 (WD Mo. 1978), and KCMSD filed a cross-claim against the State, seeking indemnification for any liability that might be imposed on KCMSD for intradistrict segregation.[2] After a lengthy trial, the District Court found that KCMSD and the State had operated a segregated school system within the KCMSD. *Jenkins* v. *Missouri*, 593 F. Supp. 1485 (1984).[3]

---

[1] This litigation has come to us once before, on the collateral issue of attorney's fees. *Missouri* v. *Jenkins*, 491 U. S. 274 (1989).

[2] The complaint originally alleged that the defendants had caused interdistrict segregation of the public schools. After KCMSD was realigned as a defendant, a group of students filed an amended complaint that also alleged intradistrict segregation. The District Court certified a plaintiff class of present and future KCMSD students.

[3] The District Court also found that none of the alleged discriminatory actions had resulted in lingering interdistrict effects and so dismissed the suburban school districts and denied interdistrict relief.

The District Court thereafter issued an order detailing the remedies necessary to eliminate the vestiges of segregation and the financing necessary to implement those remedies. *Jenkins* v. *Missouri*, 639 F. Supp. 19 (1985).[4] The District Court originally estimated the total cost of the desegregation remedy to be almost $88 million over three years, of which it expected the State to pay $67,592,072 and KCMSD to pay $20,140,472. *Id.*, at 43–44. The court concluded, however, that several provisions of Missouri law would prevent KCMSD from being able to pay its share of the obligation. *Id.*, at 44. The Missouri Constitution limits local property taxes to $1.25 per $100 of assessed valuation unless a majority of the voters in the district approve a higher levy, up to $3.25 per $100; the levy may be raised above $3.25 per $100 only if two-thirds of the voters agree. Mo. Const., Art. X, §§ 11(b),(c).[5] The "Hancock Amendment" requires property tax rates to be rolled back when property is assessed at a higher valuation to ensure that taxes will not be increased solely as a result of reassessments. Mo. Const., Art. X,

---

[4] KCMSD was ordered to improve the quality of the curriculum and library, reduce teaching load, and implement tutoring, summer school, and child development programs. The cost of these remedies was to be borne equally by the State and KCMSD. 639 F. Supp., at 28, 31–33. The District Court ordered an extensive capital improvement program to rehabilitate the deteriorating physical plant of KCMSD, the cost of which was estimated as at least $37 million, of which $27 million was to be contributed by the State. *Id.*, at 39–41. The District Court also required the defendants to encourage voluntary interdistrict transfer of students. No cost was placed on the interdistrict transfer program, but the State was ordered to underwrite the program in full. *Id.*, at 38–39. The District Court further ordered the State to fund fully other portions of the desegregation program intended to reduce class size and to improve student achievement. *Id.*, at 30, 33.

[5] KCMSD voters approved a levy of $3.75 per $100 in 1969, but efforts to raise the tax rate higher than that had consistently failed to obtain the approval of two-thirds of the voters, and the District Court found it unlikely that a proposal to raise taxes above $3.75 per $100 would receive the voters' approval. *Id.*, at 44.

§ 22(a); Mo. Rev. Stat. § 137.073.2 (1986). The Hancock Amendment thus prevents KCMSD from obtaining any revenue increase as a result of increases in the assessed valuation of real property. "Proposition C" allocates one cent of every dollar raised by the state sales tax to a schools trust fund and requires school districts to reduce property taxes by an amount equal to 50% of the previous year's sales tax receipts in the district. Mo. Rev. Stat. § 164.013.1 (Supp. 1988). However, the trust fund is allocated according to a formula that does not compensate KCMSD for the amount lost in property tax revenues, and the effect of Proposition C is to divert nearly half of the sales taxes collected in KCMSD to other parts of the State.

The District Court believed that it had the power to order a tax increase to ensure adequate funding of the desegregation plan, but it hesitated to take this step. It chose instead to enjoin the effect of the Proposition C rollback to allow KCMSD to raise an additional $4 million for the coming fiscal year. The court ordered KCMSD to submit to the voters a proposal for an increase in taxes sufficient to pay for its share of the desegregation remedy in following years. *Jenkins* v. *Missouri*, 639 F. Supp., at 45.

The Court of Appeals for the Eighth Circuit affirmed the District Court's findings of liability and remedial order in most respects. *Jenkins* v. *Missouri*, 807 F. 2d 657 (1986) (in banc). The Court of Appeals agreed with the State, however, that the District Court had failed to explain adequately why it had imposed most of the cost of the desegregation plan on the State. *Id.*, at 684, 685. The Eighth Circuit ordered the District Court to divide the cost equally between the State and KCMSD. *Id.*, at 685. We denied certiorari. *Kansas City, Missouri, School Dist.* v. *Missouri*, 484 U. S. 816 (1987).

Proceedings before the District Court continued during the appeal. In its original remedial order, the District Court had directed KCMSD to prepare a study addressing the use-

fulness of "magnet schools" to promote desegregation.[6] *Jenkins* v. *Missouri, supra,* at 34–35. A year later, the District Court approved KCMSD's proposal to operate six magnet schools during the 1986–1987 school year.[7] The court again faced the problem of funding, for KCMSD's efforts to persuade the voters to approve a tax increase had failed, as had its efforts to seek funds from the Kansas City Council and the state legislature. Again hesitating to impose a tax increase itself, the court continued its injunction against the Proposition C rollback to enable KCMSD to raise an additional $6.5 million. App. 138–142.

In November 1986, the District Court endorsed a marked expansion of the magnet school program. It adopted in substance a KCMSD proposal that every high school, every middle school, and half of the elementary schools in KCMSD become magnet schools by the 1991–1992 school year. It also approved the $142,736,025 budget proposed by KCMSD for implementation of the magnet school plan, as well as the expenditure of $52,858,301 for additional capital improvements. App. to Pet. for Cert. 120a–124a.

The District Court next considered, as the Court of Appeals had directed, how to shift the cost of desegregation to KCMSD. The District Court concluded that it would be "clearly inequitable" to require the population of KCMSD to pay half of the desegregation cost, and that "even with Court help it would be very difficult for the KCMSD to fund more than 25% of the costs of the entire remedial plan." *Id.,* at 112a. The court reasoned that the State should pay for most of the desegregation cost under the principle that "'the per-

---

[6] "Magnet schools," as generally understood, are public schools of voluntary enrollment designed to promote integration by drawing students away from their neighborhoods and private schools through distinctive curricula and high quality. See Price & Stern, Magnet Schools as a Strategy for Integration and School Reform, 5 Yale L. & Policy Rev. 291 (1987).

[7] The District Court authorized $12,972,727 for operation of the six magnet schools and $12,877,330 for further capital improvements at those schools. *Jenkins* v. *Missouri,* 639 F. Supp., at 53–55.

son who starts the fire has more responsibility for the damages caused than the person who fails to put it out,'" *id.* at 111a, and that apportionment of damages between the State and KCMSD according to fault was supported by the doctrine of comparative fault in tort, which had been adopted by the Missouri Supreme Court in *Gustafson* v. *Benda,* 661 S. W. 2d 11 (1983). The District Court then held that the State and KCMSD were 75% and 25% at fault, respectively, and ordered them to share the cost of the desegregation remedy in that proportion. To ensure complete funding of the remedy, the court also held the two tortfeasors jointly and severally liable for the cost of the plan. App. to Pet. for Cert. 113a.

Three months later, the District Court adopted a plan requiring $187,450,334 in further capital improvements. 672 F. Supp. 400, 408 (WD Mo. 1987). By then it was clear that KCMSD would lack the resources to pay for its 25% share of the desegregation cost. KCMSD requested that the District Court order the State to pay for any amount that KCMSD could not meet. The District Court declined to impose a greater share of the cost on the State, but it accepted that KCMSD had "exhausted all available means of raising additional revenue." *Id.,* at 411. Finding itself with "no choice but to exercise its broad equitable powers and enter a judgment that will enable the KCMSD to raise its share of the cost of the plan," *ibid.,* and believing that the "United States Supreme Court has stated that a tax may be increased if 'necessary to raise funds adequate to . . . operate and maintain without racial discrimination a public school system,'" *id.,* at 412 (quoting *Griffin* v. *Prince Edward County School Bd.,* 377 U. S. 218, 233 (1964)), the court ordered the KCMSD property tax levy raised from $2.05 to $4.00 per $100 of assessed valuation through the 1991–1992 fiscal year. 672 F. Supp., at 412–413.[8] KCMSD was also directed to issue $150

---

[8] The District Court also imposed a 1.5% surcharge on the state income tax levied within the KCMSD. 672 F. Supp. 400, 412 (WD Mo. 1987). The income tax surcharge was reversed by the Eighth Circuit. 855 F. 2d

million in capital improvement bonds. *Id.*, at 413. A subsequent order directed that the revenues generated by the property tax increase be used to retire the capital improvement bonds. App. to Pet. for Cert. 63a.

The State appealed, challenging the scope of the desegregation remedy, the allocation of the cost between the State and KCMSD, and the tax increase. A group of local taxpayers (Clark Group) and Jackson County, Missouri, also appealed from an order of the District Court denying their applications to intervene as of right. A panel of the Eighth Circuit affirmed in part and reversed in part. 855 F. 2d 1295 (1988). With respect to the would-be intervenors, the Court of Appeals upheld the denial of intervention. *Id.*, at 1316–1317. The scope of the desegregation order was also upheld against all the State's objections, *id.*, at 1301–1307, as was the allocation of costs, *id.*, at 1307–1308.

Turning to the property tax increase, the Court of Appeals rejected the State's argument that a federal court lacks the judicial power to order a tax increase. The Court of Appeals agreed with the District Court that *Griffin* v. *Prince Edward County School Bd.*, *supra*, at 233, had established the District Court's authority to order county officials to levy taxes.[9] Accepting also the District Court's conclusion that state law prevented KCMSD from raising funds sufficient to implement the desegregation remedy, the Court of Appeals held that such state-law limitations must fall to the command of the Constitution. 855 F. 2d, at 1313.

---

1295, 1315–1316 (1988). Respondents did not cross-petition to challenge this aspect of the Court of Appeals' judgment, so the surcharge is not before us.

[9] The Court of Appeals also relied on Circuit precedent suggesting that a district court could order a property tax increase after exploring every other fiscal alternative. *Id.*, at 1310–1311; see *Liddell* v. *Missouri*, 731 F. 2d 1294 (in banc), cert. denied, 469 U. S. 816 (1984); *United States* v. *Missouri*, 515 F. 2d 1365 (in banc), cert. denied *sub nom. Ferguson Reorganized School Dist. R–2* v. *United States*, 423 U. S. 951 (1975).

Although the Court of Appeals thus "affirm[ed] the actions that the [District] [C]ourt has taken to this point," *id.*, at 1314, it agreed with the State that principles of federal/state comity required the District Court to use "minimally obtrusive methods to remedy constitutional violations." *Ibid.* The Court of Appeals thus required that in the future, the District Court should not set the property tax rate itself but should authorize KCMSD to submit a levy to the state tax collection authorities and should enjoin the operation of state laws hindering KCMSD from adequately funding the remedy.[10] The Court of Appeals reasoned that permitting the school board to set the levy itself would minimize disruption of state laws and processes and would ensure maximum consideration of the views of state and local officials. *Ibid.*[11]

The judgment of the Court of Appeals was entered on August 19, 1988. On September 16, 1988, the State filed with the Court of Appeals a document styled "State Appellants' Petition for Rehearing En Banc." App. 489–502. Jackson County also filed a "Petition . . . for Rehearing by Court En Banc," *id.*, at 458–469, and Clark Group filed a "Petition for Rehearing En Banc with Suggestions in Support." *Id.*, at 470–488. On October 14, 1988, the Court of Appeals denied the petitions with an order stating as follows: "There are now three petitions for rehearing en banc pending before the Court. It is hereby ordered that all petitions for rehearing

---

[10] The Court of Appeals rejected the argument that such an injunction would violate the Tax Injunction Act, 28 U. S. C. § 1341, as the injunction would require the collection of additional taxes, not inhibit the collection of taxes. 855 F. 2d, at 1315. Accord, *Appling County* v. *Municipal Electric Authority of Georgia,* 621 F. 2d 1301, 1304 (CA5), cert. denied, 449 U. S. 1015 (1980).

[11] Chief Judge Lay dissented from the resolution of the property tax issue. He argued that as the State and KCMSD were jointly and severally liable for the cost of the desegregation remedy, the District Court should have allowed any amount that KCMSD was unable to pay to fall on the State rather than require the tax increase. 855 F. 2d, at 1318.

en banc are denied." App. to Pet. for Cert. 53a. The mandate of the Court of Appeals issued on October 14.

On December 31, 1988, 78 days after the issuance of the order denying rehearing and 134 days after the entry of the Court of Appeals' judgment, Jackson County presented to this Court an application for extension of time in which to file a petition for certiorari.[12] The Clerk of this Court returned the application to Jackson County as untimely. App. 503. According to the Clerk, the 90-day period in which Jackson County could petition for certiorari began to run on August 19, 1988, and expired on November 17, 1988. The Clerk informed Jackson County that although the timely filing of a "petition for rehearing" with the Court of Appeals tolls the running of the 90-day period, the filing of a "petition for rehearing en banc" does not toll the time.

On January 10, 1989, the Clerk of the Eighth Circuit issued an order amending the order of October 14, 1988. The amended order stated:

> "This Court's mandate which was issued on October 14, 1988, is hereby recalled.
> "There are three (3) *petitions for rehearing with suggestions for rehearing en banc* pending before the Court. It is hereby ordered that the petitions for rehearing and the petitions for rehearing with suggestions for rehearing en banc are denied.
> "This order is entered nunc pro tunc effective October 14, 1988. The Court's mandate shall now issue forthwith." *Id.*, at 513 (emphasis added).

---

[12] As we discuss *infra*, at 45, 28 U. S. C. § 2101(c) requires that a petition for certiorari in a civil case be filed within 90 days after the entry of the judgment sought to be reviewed. Section 2101(c) also permits a Justice of this Court, "for good cause shown," to grant an extension of time for the filing of a petition for certiorari in a civil case for a period not exceeding 60 days. In civil cases, applications for extension of time must be presented during the original 90-day period. This Court's Rule 30.2.

The State, Jackson County, and Clark Group filed petitions for certiorari within 90 days of the October 14, 1988, order. The State's petition argued that the remedies imposed by the District Court were excessive in scope and that the property tax increase violated Article III, the Tenth Amendment, and principles of federal/state comity. We denied the petitions of Jackson County and Clark Group. 490 U. S. 1034 (1989). We granted the State's petition, limited to the question of the property tax increase, but we requested the parties to address whether the petition was timely filed. 490 U. S. 1034 (1989).

II

We deal first with the question of our own jurisdiction. Title 28 U. S. C. § 2101(c) requires that a petition for certiorari in a civil case be filed within 90 days of the entry of the judgment below. This 90-day limit is mandatory and jurisdictional. We have no authority to extend the period for filing except as Congress permits. Unless the State's petition was filed within 90 days of the entry of the Court of Appeals' judgment, we must dismiss the petition.

Since *Department of Banking of Nebraska* v. *Pink*, 317 U. S. 264 (1942), it has been the consistent practice of the Court to treat petitions for rehearing timely presented to the Courts of Appeals as tolling the start of the period in which a petition for certiorari must be sought until rehearing is denied or a new judgment is entered on the rehearing.[13] As

---

[13] This practice is now reflected in this Court's Rule 13.4: "[I]f a petition for rehearing is timely filed in the lower court by any party in the case, the time for filing the petition for a writ of certiorari . . . runs from the date of the denial of the petition for rehearing or the entry of a subsequent judgment. A suggestion made to a United States court of appeals for a rehearing in banc . . . is not a petition for rehearing within the meaning of this Rule." The practice does not extend to petitions for rehearing seeking only to correct a formal defect in the judgment or opinion of the lower court. In such cases, of which *Pink* was one, "no . . . alteration of the rights [is] asked, and the finality of the court's first order [is] never sus-

was explained in *Pink*, "[a] timely petition for rehearing . . . operates to suspend the finality of the . . . court's judgment, pending the court's further determination whether the judgment should be modified so as to alter its adjudication of the rights of the parties." *Id.*, at 266. To put the matter another way, while the petition for rehearing is pending, there is no "judgment" to be reviewed. Cf. *Zimmern* v. *United States*, 298 U. S. 167, 169 (1936); *Leishman* v. *Associated Wholesale Electric Co.*, 318 U. S. 203, 205 (1943).

But as respondents point out, it has also been our consistent practice to treat suggestions for rehearing in banc presented to the United States Courts of Appeals that do not also include petitions for rehearing by the panel as not tolling the period for seeking certiorari. Our Rule 13.4 now expressly incorporates this practice. See n. 13, *supra*. This practice rests on the important distinction between "petitions for rehearing," which are authorized by Rule 40(a) of the Federal Rules of Appellate Procedure, and "suggestions for rehearing in banc," which are permitted by Rule 35(b).[14] In

---

pended." 317 U. S., at 266. See also *FTC* v. *Minneapolis-Honeywell Regulator Co.*, 344 U. S. 206 (1952).

[14] A petition for rehearing is designed to bring to the panel's attention points of law or fact that it may have overlooked. Fed. Rule App. Proc. 40(a). The panel is required to consider the contentions in the petition for rehearing, if only to reject them. Rehearing in banc is a discretionary procedure employed only to address questions of exceptional importance or to maintain uniformity among Circuit decisions. Fed. Rule App. Proc. 35(a). As the Reporter for the Advisory Committee drafting the Rules has observed: "[A] party who desires a hearing or rehearing in banc may 'suggest' the appropriateness of such a hearing. . . . The term 'suggest' was deliberately chosen to make it clear that a party's sole entitlement is to direct the attention of the court to the desirability of in banc consideration. A suggestion is neither a petition nor a motion; consequently, it requires no disposition by the court." Ward, The Federal Rules of Appellate Procedure, 28 Federal B. J. 100, 110–111 (1968); see also *Moody* v. *Albemarle Paper Co.*, 417 U. S. 622, 625 (1974) *(per curiam); Shenker* v. *Baltimore & Ohio R. Co.*, 374 U. S. 1, 5 (1963); *Western Pacific Railroad Case*, 345 U. S. 247, 258–259 (1953). Consequently, Rule 35(c) specifically provides that

this case, the State styled its filing as a "Petition for Rehearing En Banc."[15] There is technically no provision for the filing of a "Petition for Rehearing En Banc" in the Rules of Appellate Procedure. A party may petition for rehearing before the panel under Rule 40, file a suggestion for a rehearing in banc under Rule 35, or do both, separately or together. The State's filing on its face did not exactly comport with any of these options. If the filing was no more than a suggestion for rehearing in banc, as respondents insist, the petition for certiorari was untimely. But if, as the State argues, its papers qualified for treatment as a petition for rehearing within the meaning of Rule 40 as well as a suggestion for rehearing in banc under Rule 35, the 90-day period for seeking certiorari began on October 14, 1988, and the State's petition for certiorari was timely filed.

Though the matter is not without difficulty, we conclude that the State has the better of the argument. It appears to us that the Court of Appeals interpreted and actually treated the State's papers as including a petition for rehearing before the panel.[16] If the Eighth Circuit had regarded the State's

---

the filing of a suggestion for rehearing in banc, unlike a petition for rehearing, "shall not affect the finality of the judgment of the court of appeals or stay the issuance of the mandate."

[15] We note that the Federal Rules of Appellate Procedure and 28 U. S. C. § 46(c) (which provides the courts of appeals with authority to sit in banc) speak of rehearing *in* banc, not *en* banc.

[16] Although respondents do not agree that the Eighth Circuit so treated the State's papers, they do not argue the Court of Appeals lacked the power to treat the State's "Petition for Rehearing En Banc" as a petition for panel rehearing, even if it was intended subjectively and could be read objectively as only a suggestion for rehearing in banc. Furthermore, parties frequently combine a petition for rehearing and a suggestion for rehearing in banc in one document incorrectly labeled as a "petition for rehearing in banc," see Advisory Committee's Notes on Fed. Rule App. Proc. 35, 28 U. S. C. App., p. 491, and the Eighth Circuit may have believed, because of the label on the State's papers, that the State intended its filing to be read as containing both. Other Circuits routinely treat documents so la-

papers as only a suggestion for rehearing in banc, without a petition for panel rehearing as well, Rules 35(c) and 41(a) of the Federal Rules of Appellate Procedure would have required the court to issue its mandate within 21 days of the entry of the panel's judgment.[17]   The Court of Appeals did not issue the mandate within 21 days of the panel's judgment, but issued it only upon its October 14 order denying the State's petition.   Nor did the Court of Appeals issue an order extending the time for the issuance of the mandate, as it may do under Rule 41(a).

Respondents insist that the Eighth Circuit routinely withholds the mandate during the pendency of a suggestion for rehearing in banc even without the order contemplated by Rule 41(a) and point us to *United States* v. *Samuels*, 808 F. 2d 1298, 1299 (1987), where the Chief Judge of that court wrote separately respecting the denial of rehearing in banc to emphasize that the Eighth Circuit has done so.   The Court of Appeals may not on every occasion have observed the technicalities of Rules 35(c) and 41(a), but we cannot conclude from the respondents' submission that the Eighth Circuit has engaged in a systematic practice of ignoring those formalities. We presume that the Eighth Circuit withheld the mandate

---

beled as containing only suggestions for rehearing in banc.   See, *e. g.*, *United States* v. *Buljubasic*, 828 F. 2d 426 (CA7 1987).

[17] Rule 35(c) explicitly states that the pendency of a suggestion for rehearing in banc shall not "affect the finality of the judgment of the court of appeals or stay the issuance of the mandate."   Rule 41(a) requires the mandate of the Court of Appeals to issue "21 days after the entry of judgment unless the time is shortened or enlarged by order," but provides that a timely petition for panel rehearing "will stay the mandate until disposition of the petition unless otherwise ordered by the court."   This case thus stands in contrast to *United States* v. *Buljubasic, supra*, where the Court of Appeals allowed the mandate to issue even though the appellant had filed a "Petition for Rehearing En Banc."   In that case, the Court of Appeals treated the "Petition" as only a suggestion for rehearing in banc and allowed the mandate to issue, as it was required to do under Rule 35(c).

because, under Rule 41(a), it must do so when a petition for panel rehearing is pending.

It is true that the Eighth Circuit's original October 14 order stated that there were three "petitions for rehearing en banc pending before the Court" and that all "petitions for rehearing en banc" were denied. Only after this Court's Clerk informed Jackson County that its application for extension of time was untimely did the Court of Appeals amend its October 14 order *nunc pro tunc* to state that there were "petitions for rehearing with suggestions for rehearing en banc pending before the Court" and that those "petitions for rehearing . . . with suggestions for rehearing en banc" were denied. Respondents argue that the original order is more probative of the Eighth Circuit's contemporaneous treatment of the State's petition, and they contend that order clearly does not treat the petition as requesting panel rehearing. They insist that the Eighth Circuit cannot, *post hoc*, amend its order to make it appear that it took an action which it never took.

The Court of Appeals of course cannot make the record what it is not. The time for applying for certiorari will not be tolled when it appears that the lower court granted rehearing or amended its order solely for the purpose of extending that time. Cf. *Wayne United Gas Co.* v. *Owens-Illinois Glass Co.*, 300 U. S. 131, 137 (1937); *Conboy* v. *First National Bank of Jersey City*, 203 U. S. 141, 145 (1906); *Credit Co.* v. *Arkansas Central R. Co.*, 128 U. S. 258, 261 (1888). But, as we see it, that is not what happened in this case: the Eighth Circuit originally entered an order denying the "petitions for rehearing en banc" because the papers filed with the court were styled as "petitions for rehearing en banc." When it was subsequently brought to the Eighth Circuit's attention that it had neglected to refer to those papers in its order as petitions for rehearing with suggestions for rehearing in banc, the court amended its order *nunc pro tunc* to ensure that the order reflected the reality of the action taken on October 14. The Eighth Circuit surely knows

more than we do about the meaning of its orders, and we accept its action for what it purports to be.

The Eighth Circuit, unlike other Circuits, does not have a published practice of treating all suggestions for rehearing in banc, no matter how styled, as containing both petitions for panel rehearing and suggestions for rehearing in banc. Cf. *Gonzalez* v. *Southern Pacific Transportation Co.*, 773 F. 2d 637, 639 (CA5 1985); Eleventh Circuit Rule 35–6. Respondents argue that accepting the Eighth Circuit's interpretation of its October 14 order in this case risks confusion in future cases and invites the lower courts to pick and choose between those parties whose "petitions for rehearing in banc" they view favorably and wish to give additional time for seeking review in this Court, and those whose petitions they wish to give no such aid.

We share respondents' concern about the stability and clarity of jurisdictional rules. It is undoubtedly desirable to have published rules of procedure giving parties fair warning of the treatment afforded petitions for rehearing and suggestions for rehearing in banc. Regular adherence to published rules of procedure best promotes the principles of fairness, stability, and uniformity that those rules are designed to advance. But in the end we accept the Eighth Circuit's interpretation of its October 14 order and will not assume that its action in this case is not in accord with its regular practice.

### III

We turn to the tax increase imposed by the District Court. The State urges us to hold that the tax increase violated Article III, the Tenth Amendment, and principles of federal/state comity. We find it unnecessary to reach the difficult constitutional issues, for we agree with the State that the tax increase contravened the principles of comity that must govern the exercise of the District Court's equitable discretion in this area.

It is accepted by all the parties, as it was by the courts below, that the imposition of a tax increase by a federal court was an extraordinary event. In assuming for itself the fundamental and delicate power of taxation the District Court not only intruded on local authority but circumvented it altogether. Before taking such a drastic step the District Court was obliged to assure itself that no permissible alternative would have accomplished the required task. We have emphasized that although the "remedial powers of an equity court must be adequate to the task, . . . they are not unlimited," *Whitcomb* v. *Chavis*, 403 U. S. 124, 161 (1971), and one of the most important considerations governing the exercise of equitable power is a proper respect for the integrity and function of local government institutions. Especially is this true where, as here, those institutions are ready, willing, and—but for the operation of state law curtailing their powers—able to remedy the deprivation of constitutional rights themselves.

The District Court believed that it had no alternative to imposing a tax increase. But there was an alternative, the very one outlined by the Court of Appeals: it could have authorized or required KCMSD to levy property taxes at a rate adequate to fund the desegregation remedy and could have enjoined the operation of state laws that would have prevented KCMSD from exercising this power. 855 F. 2d, at 1314; see *infra*, at 52. The difference between the two approaches is far more than a matter of form. Authorizing and directing local government institutions to devise and implement remedies not only protects the function of those institutions but, to the extent possible, also places the responsibility for solutions to the problems of segregation upon those who have themselves created the problems.

As *Brown* v. *Board of Education*, 349 U. S. 294, 299 (1955), observed, local authorities have the "primary responsibility for elucidating, assessing, and solving" the problems of desegregation. See also *Milliken* v. *Bradley*, 433 U. S.

267, 281 (1977). This is true as well of the problems of financing desegregation, for no matter has been more consistently placed upon the shoulders of local government than that of financing public schools. As was said in another context, "[t]he very complexity of the problems of financing and managing a . . . public school system suggests that 'there will be more than one constitutionally permissible method of solving them,' and that . . . 'the legislature's efforts to tackle the problems' should be entitled to respect." *San Antonio Independent School District* v. *Rodriguez*, 411 U. S. 1, 42 (1973) (quoting *Jefferson* v. *Hackney*, 406 U. S. 535, 546–547 (1972)). By no means should a district court grant local government *carte blanche*, cf. *Swann* v. *Charlotte-Mecklenburg Bd. of Education*, 402 U. S. 1 (1971), but local officials should at least have the opportunity to devise their own solutions to these problems. Cf. *Sixty-seventh Minnesota State Senate* v. *Beens*, 406 U. S. 187, 196 (1972) *(per curiam)*.

The District Court therefore abused its discretion in imposing the tax itself. The Court of Appeals should not have allowed the tax increase to stand and should have reversed the District Court in this respect. See *Langnes* v. *Green*, 282 U. S. 531, 541–542 (1931).

## IV

We stand on different ground when we review the modifications to the District Court's order made by the Court of Appeals. As explained *supra*, at 43, the Court of Appeals held that the District Court in the future should authorize KCMSD to submit a levy to the state tax collection authorities adequate to fund its budget and should enjoin the operation of state laws that would limit or reduce the levy below that amount. 855 F. 2d, at 1314.[18]

---

[18] The Court of Appeals "affirm[ed] the actions that the court has taken to this point," but detailed "the procedures which the district court should use in the future." 855 F. 2d, at 1314. The Court of Appeals' discussion of the procedures to be used in the future was not dictum, for the court had before it the State's appeal from the entire funding order of the District

The State argues that the funding ordered by the District Court violates principles of equity and comity because the remedial order itself was excessive. As the State puts it, "[t]he only reason that the court below needed to consider an unprecedented tax increase was the equally unprecedented cost of its remedial programs." Brief for Petitioners 42. We think this argument aims at the scope of the remedy rather than the manner in which the remedy is to be funded and thus falls outside our limited grant of certiorari in this case. As we denied certiorari on the first question presented by the State's petition, which did challenge the scope of the remedial order, we must resist the State's efforts to argue that point now. We accept, without approving or disapproving, the Court of Appeals' conclusion that the District Court's remedy was proper. See *Cone* v. *West Virginia Pulp & Paper Co.*, 330 U. S. 212, 215 (1947).

The State has argued here that the District Court, having found the State and KCMSD jointly and severally liable, should have allowed any monetary obligations that KCMSD

Court. The Court of Appeals required the District Court to use the less obtrusive procedures beginning with the fiscal year commencing after the remand but did not require the District Court to reverse the tax increase that it had imposed for prior fiscal years. See *id.*, at 1299 ("[W]e modify [the order's] future operation to more closely comport with limitations upon our judicial authority"); *id.*, at 1318 ("We . . . remand for further modifications as provided in this opinion"). This interpretation is supported by an order of the District Court issued on January 3, 1989. The District Court took no action to reverse its tax increase through fiscal year 1988–1989. The court also denied as premature a motion by KCMSD to approve a proposed property tax levy of $4.23 for fiscal year 1989–1990. The court then directed KCMSD to "approve a property tax levy rate for 1989 at a later date when financial calculations for the 1989–1990 school year are clear and submit the proposed levy rate to the Court for approval at that time." App. 511–512. This direction indicates that the District Court understood that it was now obliged to allow KCMSD to set the tax levy itself. The District Court's approval of the levy was necessary because the Court of Appeals had required it to establish a maximum for the levy. See 855 F. 2d, at 1314.

could not meet to fall on the State rather than interfere with state law to permit KCMSD to meet them.[19]   Under the circumstances of this case, we cannot say it was an abuse of discretion for the District Court to rule that KCMSD should be responsible for funding its share of the remedy.   The State strenuously opposed efforts by respondents to make it responsible for the cost of implementing the order and had secured a reversal of the District Court's earlier decision placing on it all of the cost of substantial portions of the order. See 807 F. 2d, at 684–685.   The District Court declined to require the State to pay for KCMSD's obligations because it believed that the Court of Appeals had ordered it to allocate the costs between the two governmental entities.   See 672 F. Supp., at 411.   Furthermore, if the District Court had chosen the route now suggested by the State, implementation of the remedial order might have been delayed if the State resisted efforts by KCMSD to obtain contribution.

It is true that in *Milliken* v. *Bradley*, 433 U. S., at 291, we stated that the enforcement of a money judgment against the State did not violate principles of federalism because "[t]he District Court . . . neither attempted to restructure local governmental entities nor . . . mandat[ed] a particular method or structure of state or local financing."   But we did not there state that a district court could never set aside state laws preventing local governments from raising funds sufficient to satisfy their constitutional obligations just because those funds could also be obtained from the States.   To the contrary, 42 U. S. C. § 1983, on which respondents' complaint is based, is authority enough to require each tortfeasor to pay its share of the cost of the remedy if it can, and apportionment of the cost is part of the equitable power of the District Court.   Cf. *Milliken* v. *Bradley, supra,* at 289–290.

---

[19] See Tr. of Oral Arg. 14.   This suggestion was also made by the judge dissenting below and by Clark Group.   See 855 F. 2d, at 1318 (Lay, C. J., concurring and dissenting); Brief for Icelean Clark et al. as *Amici Curiae* 25–26.

We turn to the constitutional issues. The modifications ordered by the Court of Appeals cannot be assailed as invalid under the Tenth Amendment. "The Tenth Amendment's reservation of nondelegated powers to the States is not implicated by a federal-court judgment enforcing the express prohibitions of unlawful state conduct enacted by the Fourteenth Amendment." 433 U. S., at 291. "The Fourteenth Amendment . . . was avowedly directed against the power of the States," *Pennsylvania* v. *Union Gas Co.*, 491 U. S. 1, 42 (1989) (SCALIA, J., concurring in part and dissenting in part), and so permits a federal court to disestablish local government institutions that interfere with its commands. Cf. *New York City Bd. of Estimate* v. *Morris*, 489 U. S. 688 (1989); *Reynolds* v. *Sims*, 377 U. S. 533, 585 (1964).

Finally, the State argues that an order to increase taxes cannot be sustained under the judicial power of Article III. Whatever the merits of this argument when applied to the District Court's own order increasing taxes, a point we have not reached, see *supra*, at 53, a court order directing a local government body to levy its own taxes is plainly a judicial act within the power of a federal court. We held as much in *Griffin* v. *Prince Edward County School Bd.*, 377 U. S., at 233, where we stated that a District Court, faced with a county's attempt to avoid desegregation of the public schools by refusing to operate those schools, could "require the [County] Supervisors to exercise the power that is theirs to levy taxes to raise funds adequate to reopen, operate, and maintain without racial discrimination a public school system . . . ." *Griffin* followed a long and venerable line of cases in which this Court held that federal courts could issue the writ of mandamus to compel local governmental bodies to levy taxes adequate to satisfy their debt obligations. See, *e. g., Louisiana ex rel. Hubert* v. *Mayor and Council of New Orleans*, 215 U. S. 170 (1909); *Graham* v. *Folsom*, 200 U. S. 248 (1906); *Wolff* v. *New Orleans*, 103 U. S. 358 (1881); *United States* v. *New Orleans*, 98 U. S. 381 (1879); *Heine* v. *Levee*

*Commissioners*, 19 Wall. 655, 657 (1874); *City of Galena v. Amy*, 5 Wall. 705 (1867); *Von Hoffman v. City of Quincy*, 4 Wall. 535 (1867); *Board of Commissioners of Knox County v. Aspinwall*, 24 How. 376 (1861).[20]

The State maintains, however, that even under these cases, the federal judicial power can go no further than to require local governments to levy taxes *as authorized under state law*. In other words, the State argues that federal courts cannot set aside state-imposed limitations on local taxing authority because to do so is to do more than to require the local government "to exercise the power *that is theirs*." We disagree. This argument was rejected as early as *Von Hoffman v. City of Quincy, supra.* There the holder of bonds issued by the city sought a writ of mandamus against the city requiring it to levy taxes sufficient to pay interest

---

[20] The old cases recognized two exceptions to this rule, neither of which is relevant here. First, it was held that federal courts could not by writ of mandamus compel state officers to release funds in the state treasury sufficient to satisfy state bond obligations. The Court viewed this attempt to employ the writ of mandamus as a ruse to avoid the Eleventh Amendment's bar against exercising federal jurisdiction over the State. See *Louisiana v. Jumel*, 107 U. S. 711, 720–721 (1883). This holding has no application to this case, for the Eleventh Amendment does not bar federal courts from imposing on the States the costs of securing prospective compliance with a desegregation order, *Milliken v. Bradley*, 433 U. S. 267, 290 (1977), and does not afford local school boards like KCMSD immunity from suit, *Mt. Healthy City Bd. of Education v. Doyle*, 429 U. S. 274, 280–281 (1977). Second, it was held that the writ of mandamus would not lie to compel the collection of taxes when there was no person against whom the writ could operate. See *Meriwether v. Garrett*, 102 U. S. 472, 501 (1880); *id.*, at 515 (Field, J., concurring in judgment) ("[W]hen the law is gone, and the office of the collector abolished, there is nothing upon which the courts can act"); cf. *Wolff v. New Orleans*, 103 U. S. 358, 368 (1881) (distinguishing *Meriwether, supra*). This exception also has no application to this case, where there are state and local officials invested with authority to collect and disburse the property tax and where, as matters now stand, the District Court need only prevent those officials from applying state law that would interfere with the willing levy of property taxes by KCMSD.

coupons then due. The city defended based on a state statute that limited its power of taxation, and the Circuit Court refused to mandamus the city. This Court reversed, observing that the statute relied on by the city was passed after the bonds were issued and holding that because the city had ample authority to levy taxes to pay its bonds when they were issued, the statute impaired the contractual entitlements of the bondholders, contrary to Art. I, § 10, cl. 1, of the Constitution, under which a State may not pass any law impairing the obligation of contracts. The statutory limitation, therefore, could be disregarded and the city ordered to levy the necessary taxes to pay its bonds.

It is therefore clear that a local government with taxing authority may be ordered to levy taxes in excess of the limit set by state statute where there is reason based in the Constitution for not observing the statutory limitation. In *Von Hoffman*, the limitation was disregarded because of the Contract Clause. Here, the KCMSD may be ordered to levy taxes despite the statutory limitations on its authority in order to compel the discharge of an obligation imposed on KCMSD by the Fourteenth Amendment. To hold otherwise would fail to take account of the obligations of local governments, under the Supremacy Clause, to fulfill the requirements that the Constitution imposes on them. However wide the discretion of local authorities in fashioning desegregation remedies may be, "if a state-imposed limitation on a school authority's discretion operates to inhibit or obstruct the operation of a unitary school system or impede the disestablishing of a dual school system, it must fall; state policy must give way when it operates to hinder vindication of federal constitutional guarantees." *North Carolina Bd. of Education* v. *Swann*, 402 U. S. 43, 45 (1971). Even though a particular remedy may not be required in every case to vindicate constitutional guarantees, where (as here) it has been found that a particular remedy is required, the State cannot hinder the

process by preventing a local government from implementing that remedy.[21]

Accordingly, the judgment of the Court of Appeals is affirmed insofar as it required the District Court to modify its funding order and reversed insofar as it allowed the tax increase imposed by the District Court to stand. The case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE KENNEDY, with whom THE CHIEF JUSTICE, JUSTICE O'CONNOR, and JUSTICE SCALIA join, concurring in part and concurring in the judgment.

In agreement with the Court that we have jurisdiction to decide this case, I join Parts I and II of the opinion. I agree also that the District Court exceeded its authority by attempting to impose a tax. The Court is unanimous in its holding, that the Court of Appeals' judgment affirming "the actions that the [district] court has taken to this point," 855 F. 2d 1295, 1314 (CA8 1988), must be reversed. This is consistent with our precedents and the basic principles defining judicial power.

In my view, however, the Court transgresses these same principles when it goes further, much further, to embrace by broad dictum an expansion of power in the Federal Judiciary beyond all precedent. Today's casual embrace of taxation imposed by the unelected, life-tenured Federal Judiciary dis-

---

[21] *United States* v. *County of Macon*, 99 U. S. 582 (1879), held that mandamus would not lie to force a local government to levy taxes in excess of the limits contained in a statute in effect at the time the county incurred its bonded indebtedness, for the explicit limitation on the taxing power became part of the contract, the bondholders had notice of the limitation and were deemed to have consented to it, and hence no contractual remedy was unconstitutionally impaired by observing the statute. *County of Macon* has little relevance to the present case, for KCMSD's obligation to fund the desegregation remedy arises from its operation of a segregated school system in violation of the Constitution, not from a contract between KCMSD and respondents.

regards fundamental precepts for the democratic control of public institutions. I cannot acquiesce in the majority's statements on this point, and should there arise an actual dispute over the collection of taxes as here contemplated in a case that is not, like this one, premature, we should not confirm the outcome of premises adopted with so little constitutional justification. The Court's statements, in my view, cannot be seen as necessary for its judgment, or as precedent for the future, and I cannot join Parts III and IV of the Court's opinion.

I

Some essential litigation history is necessary for a full understanding of what is at stake here and what will be wrought if the implications of all the Court's statements are followed to the full extent. The District Court's remedial plan was proposed for the most part by the Kansas City, Missouri, School District (KCMSD) itself, which is in name a defendant in the suit. Defendants, and above all defendants that are public entities, act in the highest and best tradition of our legal system when they acknowledge fault and cooperate to suggest remedies. But in the context of this dispute, it is of vital importance to note the KCMSD demonstrated little concern for the fiscal consequences of the remedy that it helped design.

As the District Court acknowledged, the plaintiffs and the KCMSD pursued a "friendly adversary" relationship. Throughout the remedial phase of the litigation, the KCMSD proposed ever more expensive capital improvements with the agreement of the plaintiffs, and the State objected. Some of these improvements involved basic repairs to deteriorating facilities within the school system. The KCMSD, however, devised a broader concept for districtwide improvement, and the District Court approved it. The plan involved a variation of the magnet school concept. Magnet schools, as the majority opinion notes, *ante*, at 40, n. 6, offer special pro-

grams, often used to encourage voluntary movement of students within the district in a pattern that aids desegregation.

Although we have approved desegregation plans involving magnet schools of this conventional definition, see *Milliken* v. *Bradley*, 433 U. S. 267, 272 (1977), the District Court found this insufficient. App. to Pet. for Cert. 122a. Instead, the court and the KCMSD decided to make a magnet of the district as a whole. The hope was to draw new nonminority students from outside the district. The KCMSD plan adopted by the court provided that "every senior high school, every middle school, and approximately one-half of the elementary schools in the KCMSD will become magnet schools by the school year 1991–92." *Id.*, at 121a. The plan was intended to "improve the quality of education of all KCMSD students." *Id.*, at 103a. The District Court was candid to acknowledge that the "long term goal of this Court's remedial order is to make available to *all* KCMSD students educational opportunities equal to or greater than those presently available in the average Kansas City, Missouri metropolitan suburban school district." *Id.*, at 145a–146a (emphasis in original).

It comes as no surprise that the cost of this approach to the remedy far exceeded KCMSD's budget, or for that matter, its authority to tax. A few examples are illustrative. Programs such as a "performing arts middle school," *id.*, at 118a, a "technical magnet high school" that "will offer programs ranging from heating and air conditioning to cosmetology to robotics," *id.*, at 75a, were approved. The plan also included a "25 acre farm and 25 acre wildland area" for science study. *Id.*, at 20a. The court rejected various proposals by the State to make "capital improvements necessary to eliminate health and safety hazards and to provide a good learning environment," because these proposals failed to "consider the criteria of suburban comparability." *Id.*, at 70a. The District Court stated: "This 'patch and repair' approach proposed by the State would not achieve suburban comparability or the

visual attractiveness sought by the Court as it would result in floor coverings with unsightly sections of mismatched carpeting and tile, and individual walls possessing different shades of paint." *Id.*, at 70a. Finding that construction of new schools would result in more "attractive" facilities than renovation of existing ones, the District Court approved new construction at a cost ranging from $61.80 per square foot to $95.70 per square foot as distinct from renovation at $45 per square foot. *Id.*, at 76a.

By the time of the order at issue here, the District Court's remedies included some "$260 million in capital improvements and a magnet-school plan costing over $200 million." *Missouri* v. *Jenkins*, 491 U. S. 274, 276 (1989). And the remedial orders grew more expensive as shortfalls in revenue became more severe. As the Eighth Circuit judges dissenting from denial of rehearing in banc put it: "The remedies ordered go far beyond anything previously seen in a school desegregation case. The sheer immensity of the programs encompassed by the district court's order—the large number of magnet schools and the quantity of capital renovations and new construction—are concededly without parallel in any other school district in the country." 855 F. 2d, at 1318–1319.

The judicial taxation approved by the Eighth Circuit is also without parallel. Other Circuits that have faced funding problems arising from remedial decrees have concluded that, while courts have undoubted power to order that schools operate in compliance with the Constitution, the manner and methods of school financing are beyond federal judicial authority. See *National City Bank* v. *Battisti*, 581 F. 2d 565 (CA6 1977); *Plaquemines Parish School Bd.* v. *United States*, 415 F. 2d 817 (CA5 1969). The Third Circuit, while leaving open the possibility that in some situation a court-ordered tax might be appropriate, has also declined to approve judicial interference in taxation. *Evans* v. *Buchanan*, 582 F. 2d 750 (1978), cert. denied *sub nom. Alexis I. du Pont*

*School Dist.* v. *Evans,* 446 U. S. 923 (1980). The Sixth Circuit, in a somewhat different context, has recognized the severe intrusion caused by federal court interference in state and local financing. *Kelley* v. *Metropolitan County Bd. of Education of Nashville and Davidson County, Tenn.,* 836 F. 2d 986 (1987), cert. denied, 487 U. S. 1206 (1988).

Unlike these other courts, the Eighth Circuit has endorsed judicial taxation, first in dicta from cases in which taxation orders were in fact disapproved. *United States* v. *Missouri,* 515 F. 2d 1365, 1372–1373 (1975) (District Court may "implement its desegregation order by directing that provision be made for the levying of taxes"); *Liddell* v. *Missouri,* 731 F. 2d 1294, 1320, cert. denied *sub nom. Leggett* v. *Liddell,* 469 U. S. 816 (1984) (District Court may impose tax "after exploration of every other fiscal alternative"). The case before us represents the first in which a lower federal court has in fact upheld taxation to fund a remedial decree.

For reasons explained below, I agree with the Court that the Eighth Circuit's judgment affirming the District Court's direct levy of a property tax must be reversed. I cannot agree, however, that we "stand on different ground when we review the modifications to the District Court's order made by the Court of Appeals," *ante,* at 52. At the outset, it must be noted that the Court of Appeals made no "modifications" to the District Court's order. Rather, it affirmed "the actions that the court has taken to this point." 855 F. 2d, at 1314. It is true that the Court of Appeals went on "to consider the procedures which the district court should use *in the future.*" *Ibid.* (emphasis added). But the Court of Appeals' entire discussion of "a preferable method for future funding," *ibid.,* can be considered no more than dictum, the court itself having already upheld the District Court's actions to date. No other order of the District Court was before the Court of Appeals.

The Court states that the Court of Appeals' discussion of future taxation was not dictum because although the Court of

Appeals "did not require the District Court to reverse the tax increase that it had imposed for prior fiscal years," it "required the District Court to use the less obtrusive procedures beginning with the fiscal year commencing after the remand." *Ante*, at 52–53, n. 18. But no such distinction is found in the Court of Appeals' opinion. Rather, the court "affirm[ed] the actions that the [district] court has taken to this point," which included the District Court's October 27, 1987, order increasing property taxes in the KCMSD *through the end of fiscal year 1991–1992*. The District Court's January 3, 1989, order does not support, but refutes, the Court's characterization. The District Court rejected a request by the KCMSD to *increase* the property tax rate using the method endorsed by the Eighth Circuit from $4 to $4.23 per $100 of assessed valuation. The District Court reasoned that an increase in 1988 property taxes would be difficult to administer and cause resentment among taxpayers, and that an increase in 1989 property taxes would be premature because it was not yet known whether an increase would be necessary to fund expenditures. App. 511–512. In rejecting the KCMSD's request, the District Court left in effect the $4 rate it had established in its October 27, 1987, order.

Whatever the Court thinks of the Court of Appeals' opinion, the District Court on remand appears to have thought it was under no compulsion to disturb its existing order establishing the $4 property tax rate through fiscal year 1991–1992 unless and until it became necessary to *raise* property taxes even higher. The Court's discussion today, and its stated approval of the "method for future funding" found "preferable" by the Court of Appeals, is unnecessary for the decision in this case. As the Court chooses to discuss the question of future taxation, however, I must state my respectful disagreement with its analysis and conclusions on this vital question.

The premise of the Court's analysis, I submit, is infirm. Any purported distinction between direct imposition of a tax

by the federal court and an order commanding the school district to impose the tax is but a convenient formalism where the court's action is predicated on elimination of state-law limitations on the school district's taxing authority. As the Court describes it, the local KCMSD possesses plenary taxing powers, which allow it to impose any tax it chooses if not "hinder[ed]" by the Missouri Constitution and state statutes. *Ante*, at 57. This puts the conclusion before the premise. Local government bodies in Missouri, as elsewhere, must derive their power from a sovereign, and that sovereign is the State of Missouri. See Mo. Const., Art. X, § 1 (political subdivisions may exercise only "[tax] power granted to them" by Missouri General Assembly). Under Missouri law, the KCMSD has power to impose a limited property tax levy up to $1.25 per $100 of assessed value. The power to exact a higher rate of property tax remains with the people, a majority of whom must agree to empower the KCMSD to increase the levy up to $3.75 per $100, and two-thirds of whom must agree for the levy to go higher. See Mo. Const., Art. X, §§ 11(b),(c). The Missouri Constitution states that "[p]roperty taxes and other local taxes . . . may not be increased above the limitations specified herein without direct voter approval as provided by this constitution." Mo. Const., Art. X, § 16.

For this reason, I reject the artificial suggestion that the District Court may, by "prevent[ing] . . . officials from applying state law that would interfere with the willing levy of property taxes by KCMSD," *ante*, at 56, n. 20, cause the KCMSD to exercise power under *state* law. State laws, including taxation provisions legitimate and constitutional in themselves, define the power of the KCMSD. Cf. *Washington* v. *Washington Commercial Passenger Fishing Vessel Assn.*, 443 U. S. 658, 695 (1979) (whether a state agency "may be ordered actually to promulgate regulations having effect as a matter of state law may well be doubtful"). Absent a change in state law, no increase in property taxes could take

place in the KCMSD without a federal court order. It makes no difference that the KCMSD stands "ready, willing, and . . . able" to impose a tax not authorized by state law. *Ante*, at 51. Whatever taxing power the KCMSD may exercise outside the boundaries of state law would derive from the federal court. The Court never confronts the judicial authority to issue an order for this purpose. Absent a change in state law, the tax is imposed by federal authority under a federal decree. The question is whether a district court possesses a power to tax under federal law, either directly or through delegation to the KCMSD.

## II

Article III of the Constitution states that "[t]he judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." The description of the judicial power nowhere includes the word "tax" or anything that resembles it. This reflects the Framers' understanding that taxation was not a proper area for judicial involvement. "The judiciary . . . has no influence over either the sword or the purse, no direction either of the strength or of the wealth of the society, and can take no active resolution whatever." The Federalist No. 78, p. 523 (J. Cooke ed. 1961) (A. Hamilton).

Our cases throughout the years leave no doubt that taxation is not a judicial function. Last Term we rejected the invitation to cure an unconstitutional tax scheme by broadening the class of those taxed. We said that such a remedy "could be construed as the direct imposition of a state tax, a remedy beyond the power of a federal court." *Davis* v. *Michigan Dept. of Treasury*, 489 U. S. 803, 818 (1989). Our statement in *Davis* rested on the explicit holding in *Moses Lake Homes, Inc.* v. *Grant County*, 365 U. S. 744 (1961), in which we reversed a judgment directing a District Court to decree a valid tax in place of an invalid one that the State had attempted to enforce:

"The effect of the Court's remand was to direct the District Court to decree a valid tax for the invalid one which the State had attempted to exact. The District Court has no power so to decree. Federal courts may not assess or levy taxes. Only the appropriate taxing officials of Grant County may assess and levy taxes on these leaseholds, and the federal courts may determine, within their jurisdiction, only whether the tax levied by those officials is or is not a valid one." *Id.*, at 752.

The nature of the District Court's order here reveals that it is not a proper exercise of the judicial power. The exercise of judicial power involves adjudication of controversies and imposition of burdens on those who are parties before the Court. The order at issue here is not of this character. It binds the broad class of all KCMSD taxpayers. It has the purpose and direct effect of extracting money from persons who have had no presence or representation in the suit. For this reason, the District Court's direct order imposing a tax was more than an abuse of discretion, for any attempt to collect the taxes from the citizens would have been a blatant denial of due process.

Taxation by a legislature raises no due process concerns, for the citizens' "rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule." *Bi-Metallic Co. v. Colorado State Bd. of Equalization*, 239 U. S. 441, 445 (1915). The citizens who are taxed are given notice and a hearing through their representatives, whose power is a direct manifestation of the citizens' consent. A true exercise of judicial power provides due process of another sort. Where money is extracted from parties by a court's judgment, the adjudication itself provides the notice and opportunity to be heard that due process demands before a citizen may be deprived of property.

The order here provides neither of these protections. Where a tax is imposed by a governmental body other than

the legislature, even an administrative agency to which the legislature has delegated taxing authority, due process requires notice to the citizens to be taxed and some opportunity to be heard. See, *e. g.*, *Londoner* v. *Denver*, 210 U. S. 373, 385–386 (1908). The citizens whose tax bills would have been doubled under the District Court's direct tax order would not have had these protections. The taxes were imposed by a District Court that was not "representative" in any sense, and the individual citizens of the KCMSD whose property (they later learned) was at stake were neither served with process nor heard in court. The method of taxation endorsed by today's dicta suffers the same flaw, for a district court order that overrides the citizens' state-law protection against taxation without referendum approval can in no sense provide representational due process. No one suggests the KCMSD taxpayers are parties.

A judicial taxation order is but an attempt to exercise a power that always has been thought legislative in nature. The location of the federal taxing power sheds light on today's attempt to approve judicial taxation at the local level. Article I, § 1, states that *"[a]ll* legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." (Emphasis added.) The list of legislative powers in Article I, § 8, cl. 1, begins with the statement that "[t]he *Congress* shall have Power To lay and collect Taxes. . . ." As we have said, "[t]axation is a legislative function, and Congress . . . is the sole organ for levying taxes." *National Cable Television Assn., Inc.* v. *United States*, 415 U. S. 336, 340 (1974) (citing Article I, § 8, cl. 1).

True, today's case is not an instance of one branch of the Federal Government invading the province of another. It is instead one that brings the weight of federal authority upon a local government and a State. This does not detract, however, from the fundamental point that the Judiciary is not free to exercise all federal power; it may exercise only the

judicial power. And the important effects of the taxation order discussed here raise additional federalism concerns that counsel against the Court's analysis.

In perhaps the leading case concerning desegregation remedies, *Milliken* v. *Bradley*, 433 U. S. 267 (1977), we upheld a prospective remedial plan, not a "money judgment," *ante*, at 54, against a State's claim that principles of federalism had been ignored in the plan's implementation. In so doing the Court emphasized that the District Court had "neither attempted to restructure local governmental entities nor to mandate a particular method or structure of state or local financing." 433 U. S., at 291. No such assurances emerge from today's decision, which endorses federal-court intrusion into these precise matters. Our statement in a case decided more than 100 years ago should apply here.

> "This power to impose burdens and raise money is the highest attribute of sovereignty, and is exercised, first, to raise money for public purposes only; and, second, by the power of legislative authority only. It is a power that has not been extended to the judiciary. Especially is it beyond the power of the Federal judiciary to assume the place of a State in the exercise of this authority at once so delicate and so important." *Rees* v. *City of Watertown*, 19 Wall. 107, 116–117 (1874).

The confinement of taxation to the legislative branches, both in our Federal and State Governments, was not random. It reflected our ideal that the power of taxation must be under the control of those who are taxed. This truth animated all our colonial and revolutionary history.

> "Your Memorialists conceive it to be a fundamental Principle . . . without which Freedom can no Where exist, that the People are not subject to any Taxes but such as are laid on them by their own Consent, or by those who are legally appointed to represent them: Property must become too precarious for the Genius of a free People

which can be taken from them at the Will of others, who cannot know what Taxes such people can bear, or the easiest Mode of raising them; and who are not under that Restraint, which is the greatest Security against a burthensome Taxation, when the Representatives themselves must be affected by every tax imposed on the People." Virginia Petitions to King and Parliament, December 18, 1764, reprinted in The Stamp Act Crisis 41 (E. Morgan ed. 1952).

The power of taxation is one that the Federal Judiciary does not possess. In our system "the legislative department alone has access to the pockets of the people," The Federalist No. 48, p. 334 (J. Cooke ed. 1961) (J. Madison), for it is the Legislature that is accountable to them and represents their will. The authority that would levy the tax at issue here shares none of these qualities. Our Federal Judiciary, by design, is not representative or responsible to the people in a political sense; it is independent. Federal judges do not depend on the popular will for their office. They may not even share the burden of taxes they attempt to impose, for they may live outside the jurisdiction their orders affect. And federal judges have no fear that the competition for scarce public resources could result in a diminution of their salaries. It is not surprising that imposition of taxes by an authority so insulated from public communication or control can lead to deep feelings of frustration, powerlessness, and anger on the part of taxpaying citizens.

The operation of tax systems is among the most difficult aspects of public administration. It is not a function the Judiciary as an institution is designed to exercise. Unlike legislative bodies, which may hold hearings on how best to raise revenues, all subject to the views of constituents to whom the Legislature is accountable, the Judiciary must grope ahead with only the assistance of the parties, or perhaps random *amici curiae*. Those hearings would be without principled direction, for there exists no body of juridical axioms by

which to guide or review them. On this questionable basis, the Court today would give authority for decisions that affect the life plans of local citizens, the revenue available for competing public needs, and the health of the local economy.

Day-to-day administration of the tax must be accomplished by judicial trial and error, requisitioning the staff of the existing tax authority, or the hiring of a staff under the direction of the judge. The District Court orders in this case suggest the pitfalls of the first course. See App. to Pet. for Cert. 55a (correcting order for assessment of penalties for nonpayment that "mistakenly" assessed penalties on an extra tax year); *id.*, at 57a ("clarify[ing]" the inclusion of savings and loan institutions, estates, trusts, and beneficiaries in the court's income tax surcharge and enforcement procedures). Forcing citizens to make financial decisions in fear of the fledgling judicial tax collector's next misstep must detract from the dignity and independence of the federal courts.

The function of hiring and supervising a staff for what is essentially a political function has other complications. As part of its remedial order, for example, the District Court ordered the hiring of a "public information specialist," at a cost of $30,000. The purpose of the position was to "solicit community support and involvement" in the District Court's desegregation plan. See *id.*, at 191a. This type of order raises a substantial question whether a district court may extract taxes from citizens who have no right of representation and then use the funds for expression with which the citizens may disagree. Cf. *Abood* v. *Detroit Bd. of Education*, 431 U. S. 209 (1977).

The Court relies on dicta from *Griffin* v. *Prince Edward County School Bd.*, 377 U. S. 218 (1964), to support its statements on judicial taxation. In *Griffin*, the Court faced an unrepentent and recalcitrant school board that attempted to provide financial support for white schools while refusing to operate schools for black schoolchildren. We stated that the District Court could "require the Supervisors to exercise the

power *that is theirs* to levy taxes to raise funds adequate to reopen, operate, and maintain without racial discrimination a public school system." *Id.*, at 233 (emphasis added). There is no occasion in this case to discuss the full implications of *Griffin*'s observation, for it has no application here. *Griffin* endorsed the power of a federal court to order the local authority to exercise *existing* authority to tax.

This case does not involve an order to a local government with plenary taxing power to impose a tax, or an order directed at one whose taxing power has been limited by a state law enacted in order to thwart a federal court order. An order of this type would find support in the *Griffin* dicta and present a closer question than the one before us. Yet that order might implicate as well the "perversion of the normal legislative process" that we have found troubling in other contexts. See *Spallone* v. *United States*, 493 U. S. 265, 280 (1990). A legislative vote taken under judicial compulsion blurs lines of accountability by making it appear that a decision was reached by elected representatives when the reality is otherwise. For this reason, it is difficult to see the difference between an order to tax and direct judicial imposition of a tax.

The Court asserts that its understanding of *Griffin* follows from cases in which the Court upheld the use of mandamus to compel local officials to collect taxes that were authorized under state law in order to meet bond obligations. See *ante*, at 55–57. But as discussed *supra*, at 63–65, there was no state authority in this case for the KCMSD to exercise. In this situation, there could be no authority for a judicial order touching on taxation. See *United States* v. *County of Macon*, 99 U. S. 582, 591 (1879) (where the statute empowering the corporation to issue bonds contains a limit on the taxing power, federal court has no power of mandamus to compel a levy in excess of that power; "We have no power by *mandamus* to compel a municipal corporation to levy a tax which the law does not authorize. We cannot create new

rights or confer new powers.    All we can do is to bring existing powers into operation").

The Court cites a single case, *Von Hoffman* v. *City of Quincy*, 4 Wall. 535 (1867), for the proposition that a federal court may set aside state taxation limits that interfere with the remedy sought by the district court.    But the Court does not heed *Von Hoffman*'s holding.    There a municipality had authorized a tax levy in support of a specific bond obligation, but later limited the taxation authority in a way that impaired the bond obligation.    The Court held the subsequent limitation itself unconstitutional, a violation of the Contracts Clause.    Once the limitation was held invalid, the original specific grant of authority remained.    There is no allegation here, nor could there be, that the neutral tax limitations imposed by the people of Missouri are unconstitutional.    Compare Tr. of Oral Arg. 41 ("nothing in the record to suggest" that tax limitation was intended to frustrate desegregation) with *Griffin, supra,* at 221 (State Constitution amended as part of state and school district plan to resist desegregation). The majority appears to concede that the Missouri tax law does not violate a specific provision of the Constitution, stating instead that state laws may be disregarded on the basis of a vague "reason based in the Constitution."    *Ante,* at 57. But this broad suggestion does not follow from the holding in *Von Hoffman.*

Examination of the "long and venerable line of cases," *ante,* at 55, cited by the Court to endorse judicial taxation reveals the lack of real support for the Court's rationale.    One group of these cases holds simply that the common-law writ of mandamus lies to compel a local official to perform a clear duty imposed by state law.    See *United States* v. *New Orleans,* 98 U. S. 381 (1879) (reaffirming legislative nature of the taxing power and the availability of mandamus to compel officers to levy a tax where they were required by state law to do so); *City of Galena* v. *Amy,* 5 Wall. 705 (1867) (mandamus to state officials to collect a tax authorized by state law

in order to fund a state bond obligation); *Board of Commissioners of Knox County* v. *Aspinwall*, 24 How. 376 (1861) (state statute gave tax officials authority to levy the tax needed to satisfy a bond obligation and explicitly required them to do so; mandamus was proper to compel performance of this "plain duty" under state law). These common-law mandamus decisions do not purport to involve the Federal Constitution or remedial powers.

A second set of cases, including the *Von Hoffman* case relied upon by the Court, invalidates on Contracts Clause grounds statutory limitations on taxation power passed subsequent to grants of tax authority in support of bond obligations. See *Louisiana ex rel. Hubert* v. *Mayor and Council of New Orleans*, 215 U. S. 170 (1909) (state law authorized municipal tax in support of bond obligation; subsequent legislation removing the authority is invalid under Contracts Clause, and mandamus will lie against municipal official to collect the tax); *Graham* v. *Folsom*, 200 U. S. 248 (1906) (where state municipality enters into a bond obligation based on delegated state power to collect a tax, State may not by subsequent abolition of the municipality remove the taxing power; such an act is itself invalid as a violation of the Contracts Clause); *Wolff* v. *New Orleans*, 103 U. S. 358 (1881) (same). These cases, like *Von Hoffman*, are inapposite because there is no colorable argument that the provision of the Missouri Constitution limiting property tax assessments itself violates the Federal Constitution.

A third group of cases involving taxation and municipal bonds is more relevant. These cases hold that where there is no state or municipal taxation authority that the federal court may by mandamus command the officials to exercise, the court is itself without authority to order taxation. In some of these cases, the officials charged with administering the tax resigned their positions, and the Court held that no judicial remedy was available. See *Heine* v. *Levee Commissioners*, 19 Wall. 655 (1874) (where the levee commissioners

had resigned their office no one remained on whom the mandamus could operate). In *Heine*, the Court held that it had no equitable power to impose a tax in order to prevent the plaintiff's right from going without a remedy.

> "The power we are here asked to exercise is the very delicate one of taxation. This power belongs in this country to the legislative sovereignty, State or National. . . . It certainly is not vested, as in the exercise of an original jurisdiction, in any Federal court. It is unreasonable to suppose that the legislature would ever select a Federal court for that purpose. It is not only not one of the inherent powers of the court to levy and collect taxes, but it is an invasion by the judiciary of the Federal government of the legislative functions of the State government. It is a most extraordinary request, and a compliance with it would involve consequences no less out of the way of judicial procedure, the end of which no wisdom can foresee." *Id.*, at 660–661.

Other cases state more broadly that absent state authority for a tax levy, the exercise of which may be compelled by mandamus, the federal court is without power to impose any tax. See *Meriwether* v. *Garrett*, 102 U. S. 472 (1880) (where State repealed municipal charter, federal court had no authority to impose taxes, which may be collected only under authority from the legislature); *id.*, at 515 (Field, J., concurring in judgment) ("The levying of taxes is not a judicial act. It has no elements of one"); *United States* v. *County of Macon*, 99 U. S. 582 (1879) (no authority to compel a levy higher than state law allowed outside situation where a subsequent limitation violated Contracts Clause); *Rees* v. *City of Watertown*, 19 Wall. 107 (1874) (holding mandamus unavailable where officials have resigned, and that tax limitation in effect when bond obligation was undertaken may not be exceeded by court order).

With all respect, it is this third group of cases that applies. The majority would limit these authorities to a narrow "ex-

ceptio[n]" for cases where local officers resigned. *Ante*, at 56, n. 20. This is not an accurate description. Rather, the cases show that where a limitation on the local authority's taxing power is not a subsequent enactment itself in violation of the Contracts Clause, a federal court is without power to order a tax levy that goes beyond the authority granted by state law. The Court states that the KCMSD *was* "invested with authority to collect and disburse the property tax." *Ibid.* Invested by whom? It is plain that the KCMSD had no such power under state law. That being so, the authority to levy a higher tax would have to come from the federal court. The very cases cited by the majority show that a federal court has no such authority.

At bottom, today's discussion seems motivated by the fear that failure to endorse judicial taxation power might in some extreme circumstance leave a court unable to remedy a constitutional violation. As I discuss below, I do not think this possibility is in reality a significant one. More important, this possibility is nothing more or less than the necessary consequence of *any* limit on judicial power. If, however, judicial discretion is to provide the sole limit on judicial remedies, that discretion must counsel restraint. Ill-considered entry into the volatile field of taxation is a step that may place at risk the legitimacy that justifies judicial independence.

## III

One of the most troubling aspects of the Court's opinion is that discussion of the important constitutional issues of judicial authority to tax need never have been undertaken to decide this case. Even were I willing to accept the Court's proposition that a federal court might in some extreme case authorize taxation, this case is not the one. The suggestion that failure to approve judicial taxation here would leave constitutional rights unvindicated rests on a presumption that the District Court's remedy is the *only* possible cure for the constitutional violations it found. Neither our precedents

nor the record support this view. In fact, the taxation power is sought here on behalf of a remedial order unlike any before seen.

It cannot be contended that interdistrict comparability, which was the ultimate goal of the District Court's orders, is itself a constitutional command. We have long since determined that "unequal expenditures between children who happen to reside in different districts" do not violate the Equal Protection Clause. *San Antonio Independent School Dist.* v. *Rodriguez*, 411 U. S. 1, 54–55 (1973). The District Court in this case found, and the Court of Appeals affirmed, that there was no interdistrict constitutional violation that would support mandatory interdistrict relief. See *Jenkins* v. *Missouri*, 807 F. 2d 657 (CA8 1986). Instead, the District Court's conclusion that desegregation might be easier if more nonminority students could be attracted into the KCMSD was used as the hook on which to hang numerous policy choices about improving the quality of education in general within the KCMSD. The State's complaint that this suit represents the attempt of a school district that could not obtain public support for increased spending to enlist the District Court to finance its educational policy cannot be dismissed out of hand. The plaintiffs and KCMSD might well be seen as parties that have "joined forces apparently for the purpose of extracting funds from the state treasury." *Milliken* v. *Bradley*, 433 U. S., at 293 (Powell, J., concurring in judgment).

This Court has never approved a remedy of the type adopted by the District Court. There are strong arguments against the validity of such a plan. A remedy that uses the quality of education as a lure to attract nonminority students will place the District Court at the center of controversies over educational philosophy that by tradition are left to this Nation's communities. Such a plan as a practical matter raises many of the concerns involved in interdistrict desegregation remedies. Cf. *Milliken* v. *Bradley*, 418 U. S. 717

(1974) (invalidating interdistrict remedial plan). District courts can and must take needed steps to eliminate racial discrimination and ensure the operation of unitary school systems. But it is discrimination, not the ineptitude of educators or the indifference of the public, that is the evil to be remedied. An initial finding of discrimination cannot be used as the basis for a wholesale shift of authority over day-to-day school operations from parents, teachers, and elected officials to an unaccountable district judge whose province is law, not education.

Perhaps it is good educational policy to provide a school district with the items included in the KCMSD capital improvement plan, for example: high schools in which every classroom will have air conditioning, an alarm system, and 15 microcomputers; a 2,000-square-foot planetarium; greenhouses and vivariums; a 25-acre farm with an air-conditioned meeting room for 104 people; a Model United Nations wired for language translation; broadcast capable radio and television studios with an editing and animation lab; a temperature controlled art gallery; movie editing and screening rooms; a 3,500-square-foot dust-free diesel mechanics room; 1,875-square-foot elementary school animal rooms for use in a zoo project; swimming pools; and numerous other facilities. But these items are a part of legitimate political debate over educational policy and spending priorities, not the Constitution's command of racial equality. Indeed, it may be that a mere 12-acre petting farm, or other corresponding reductions in court-ordered spending, might satisfy constitutional requirements, while preserving scarce public funds for legislative allocation to other public needs, such as paving streets, feeding the poor, building prisons, or housing the homeless. Perhaps the KCMSD's Classical Greek theme schools emphasizing forensics and self-government will provide exemplary training in participatory democracy. But if today's dicta become law, such lessons will be of little use to students who grow up to become taxpayers in the KCMSD.

I am required in light of our limited grant of certiorari to assume that the remedy chosen by the District Court was a permissible exercise of its remedial discretion. But it is misleading to suggest that a failure to fund this particular remedy would leave constitutional rights without a remedy. In fact, the District Court acknowledged in its very first remedial order that the development of a remedy in this case would involve "a choice among a wide range of possibilities." App. to Pet. for Cert. 153a. Its observation was consistent with our cases concerning the scope of equitable remedies, which have recognized that "equity has been characterized by a practical flexibility in shaping its remedies." *Brown* v. *Board of Education*, 349 U. S. 294, 300 (1955).

Any argument that the remedy chosen by the District Court was the only one possible is in fact unsupportable in light of our previous cases. We have approved desegregation orders using assignment changes and some ancillary education programs to ensure the operation of a unitary school system for the district's children. See, *e. g.*, *Columbus Bd. of Education* v. *Penick*, 443 U. S. 449 (1979); *Dayton Bd. of Education* v. *Brinkman*, 433 U. S. 406 (1977). To suggest that a constitutional violation will go unremedied if a district does not, though capital improvements or other means, turn every school into a magnet school, and the entire district into a magnet district, is to suggest that the remedies approved in our past cases should have been disapproved as insufficient to deal with the violations. The truth of the matter is that the remedies in those cases were permissible choices among the many that might be adopted by a district court.

The prudence we have required in other areas touching on federal court intrusion in local government, see, *e. g.*, *Spallone* v. *United States*, 493 U. S. 265 (1990), is missing here. Even on the assumption that a federal court might order taxation in an extreme case, the unique nature of the taxing power would demand that this remedy be used as a last resort. In my view, a taxation order should not even be

considered, and this Court need never have addressed the question, unless there has been a finding that without the particular remedy at issue the constitutional violation will go unremedied. By this I do not mean that the remedy is, as we assume this one was, within the broad discretion of the district court. Rather, as a prerequisite to considering a taxation order, I would require a finding that that any remedy less costly than the one at issue would so plainly leave the violation unremedied that its implementation would itself be an abuse of discretion. There is no showing in this record that, faced with the revenue shortfall, the District Court gave due consideration to the possibility that another remedy among the "wide range of possibilities" would have addressed the constitutional violations without giving rise to a funding crisis.

The District Court here did consider alternatives to the taxing measures it imposed, but only *funding* alternatives. See, *e. g.*, App. to Pet. for Cert. 86a. There is no indication in the record that the District Court gave any consideration to the possibility that an alternative remedial plan, while less attractive from an educational policy viewpoint, might nonetheless suffice to cure the constitutional violation. Rather, it found only that the taxation orders were necessary to fund the particular remedy it had devised. This Court, with full justification, has given latitude to the district judges that must deal with persisting problems of desegregation. Even when faced with open defiance of the mandate of educational equality, however, no court has ever found necessary a remedy of the scope presented here. For this reason, no order of taxation has ever been approved. The Court fails to provide any explanation why this case presents the need to endorse by dictum so drastic a step.

The suggestion that our limited grant of certiorari requires us to decide this case blinkered as to the actual remedy underlying it, *ante*, at 53, is ill founded. A limited grant of certiorari is not a means by which the Court can pose for itself

an abstract question. Our jurisdiction is limited to particular cases and controversies. U. S. Const., Art. III, § 2, cl. 1. The only question this Court has authority to address is whether a judicial tax was appropriate *in this case*. Moreover, the petition for certiorari in this case included the contention that the District Court should not have considered the power to tax before considering whether its choice of remedy was the only possible way to achieve desegregation as a part of its argument on Question 2, which the Court granted. Pet. for Cert. 27. Far from being an improper invitation to go outside the question presented, attention to the extraordinary remedy here is the Court's duty. This would be a far more prudent course than recharacterizing the case in an attempt to reach premature decision on an important question. If the Court is to take upon itself the power to tax, respect for its own integrity demands that the power be exercised in support of true constitutional principle, not "suburban comparability" and "visual attractiveness."

## IV

This case is a stark illustration of the ever-present question whether ends justify means. Few ends are more important than enforcing the guarantee of equal educational opportunity for our Nation's children. But rules of taxation that override state political structures not themselves subject to any constitutional infirmity raise serious questions of federal authority, questions compounded by the odd posture of a case in which the Court assumes the validity of a novel conception of desegregation remedies we never before have approved. The historical record of voluntary compliance with the decree of *Brown* v. *Board of Education* is not a proud chapter in our constitutional history, and the judges of the District Courts and Courts of Appeals have been courageous and skillful in implementing its mandate. But courage and skill must be exercised with due regard for the proper and historic role of the courts.

I do not acknowledge the troubling departures in today's majority opinion as either necessary or appropriate to ensure full compliance with the Equal Protection Clause and its mandate to eliminate the cause and effects of racial discrimination in the schools. Indeed, while this case happens to arise in the compelling context of school desegregation, the principles involved are not limited to that context. There is no obvious limit to today's discussion that would prevent judicial taxation in cases involving prisons, hospitals, or other public institutions, or indeed to pay a large damages award levied against a municipality under 42 U. S. C. § 1983. This assertion of judicial power in one of the most sensitive of policy areas, that involving taxation, begins a process that over time could threaten fundamental alteration of the form of government our Constitution embodies.

James Madison observed: "Justice is the end of government. It is the end of civil society. It ever has been, and ever will be pursued, until it be obtained, or until liberty be lost in the pursuit." The Federalist, No. 51, p. 352 (J. Cooke ed. 1961). In pursuing the demand of justice for racial equality, I fear that the Court today loses sight of other basic political liberties guaranteed by our constitutional system, liberties that can coexist with a proper exercise of judicial remedial powers adequate to correct constitutional violations.