**John DILLARD, et al., Plaintiffs,**

v.

**CITY OF FOLEY, Defendant.**

**Civil Action No. 87–T–1213–N.**

United States District Court,
M.D. Alabama,
Northern Division.

Oct. 30, 1995.

Order Denying Modification
Feb. 13, 1996.

James U. Blacksher, Birmingham, AL, Neil Bradley, Laughlin McDonald, Mary Wyckoff, ACLU Foundation, Atlanta, GA, Julius L. Chambers, Scherlyn Ifill, Jacqueline A. Berrien, NAACP Legal Defense Fund, New York City, Edward Still, Birmingham, AL, J. Gerald Hebert, Alexandria, VA, for John Dillard, Damascus Crittenden, Jr., Earwen Ferrell, Clarence J. Jarrells, Ullysses McBride, Louis and Hall, Jr.

Clement C. Torbert, Jr., Maynard, Cooper & Gale, P.C., Montgomery, AL, Caine O'Rear, Hand Arendall, L.L.C., Mobile, AL, Mortimer Parker Ames, III, James H. Evans, Office of the Attorney General, Montgomery, AL, C.G. Chason, Chason & Underwood, Foley, AL, for City of Foley.

## ORDER

MYRON H. THOMPSON, Chief Judge.

This case is now before the court on the parties' joint motion for approval and entry of a consent decree. The consent decree was submitted in settlement of additional claims brought by the plaintiffs, who represent a class of African–Americans, against the defendant City of Foley, Alabama, pursuant to § 2 of the Voting Rights Act, as amended, 42 U.S.C.A. § 1973 (West 1994), and the four-

teenth and fifteenth amendments to the United States Constitution. Also before the court are a motion to intervene and an objection to the consent decree filed by the City of Gulf Shores and an objection filed by two residents of an area neighboring Foley. A hearing was heard on both motions and objections on September 6, 1995. For the reasons that follow, the consent decree will be approved, Gulf Shores's motion to intervene will be denied, and both objections will be overruled.

## I.

This lawsuit originally arose as a class action challenging Foley's at-large method of electing city council members as a violation of § 2 of the Voting Rights Act. In an order entered on May 16, 1989, the court found a violation of § 2, and Foley subsequently modified its election procedures and received preclearance for its election scheme from the United States Department of Justice pursuant to § 5 of the Voting Rights Act, as amended, 42 U.S.C.A. § 1973c (West 1994). The court retained its jurisdiction over the case pursuant to an agreement of the parties.

In 1989 and 1993, pursuant to § 5, Foley made submissions to the Department of Justice regarding a series of annexations it sought of areas outside of the city boundaries. The Attorney General objected to several of the annexations, stating that an attempted 1993 annexation "reflected a continuation of the city's ... practice of annexing areas that can be expected to contain predominantly white population, while discouraging the annexation of areas of predominantly black population." Specifically, the Attorney General cited Foley's failure to offer a legitimate, non-racial justification for its willingness to encourage annexation petitions from majority-white residential areas while discouraging and rejecting petition efforts from two majority-black residential areas, Mills Quarters and Beulah Heights. Foley did not respond to the Attorney General's objections and did not make any remedial efforts. Because they have not received the necessary § 5 preclearance, none of Foley's attempted residential annexations since 1989 has been legally enforceable.

On September 27, 1994, the plaintiffs filed a motion petitioning this court for further relief, claiming that Foley had engaged in racially-discriminatory annexation policies in violation of § 2 and the fourteenth and fifteenth amendments. According to the plaintiffs, the City of Foley has consistently "applied disparate and more difficult standards for annexation of geographic areas wherein black citizens reside than the standards applied to geographic areas wherein white citizens reside or will reside." As evidence of the racially-selective annexation policy, the plaintiffs allege that Mills Quarters had actively sought annexation and was rejected by Foley, and that Beulah Heights had petitioned for annexation and never got a response from Foley. Meanwhile, the plaintiffs allege, Foley affirmatively sought annexation of areas with mostly white residents.

On June 28, 1995, after engaging in settlement negotiations mediated by a Magistrate Judge, the parties submitted a joint motion for settlement and a proposed consent decree. The parties published a court-approved notice in one local paper weekly for four weeks and in another local paper weekly for three weeks. The notice summarized the terms of the proposed consent decree, advised readers how to register objections, and provided the location and time of a public fairness hearing. The court received a motion for intervention from Gulf Shores and two objections to the consent decree, one from Gulf Shores and one from two resident landowners in an area neighboring Foley. The court held a hearing on Gulf Shores's motion and the objections and provided an opportunity for class and non-class members to express their opinions on the proposed settlement.

The consent decree adopts as a finding of the court the fact that the plaintiffs' proof of a racially-selective annexation policy, if unrebutted, would establish a prima facie violation of § 2 of the Voting Rights Act and the United States Constitution. The decree further would prohibit Foley from adopting or undertaking any policy or practice regarding annexations which is racially discriminatory. It would require Foley to make remedial efforts, subject to preclearance by the De-

partment of Justice. To this end, the decree would require Foley to hold referenda on annexation in seven areas adjacent to the city, Areas 1 through 6 on the attached map (1, 1A, 2, 3, 4, 5, and 6). Two of these areas, Mills Quarters and Beulah Heights (Areas 1 and 5), comprise primarily black residents. The other five areas are largely uninhabited or inhabited by white residents.

According to the terms of the proposed consent decree, all seven areas could hold binding annexation referenda, and any or all areas with majority support for annexation would be immediately incorporated into Foley. This annexation procedure would dispense with some of the provisions of §§ 11–42–2 and 11–42–21 of the 1975 Alabama Code (Michie 1989), which require the consent of certain landowners in areas contemplating annexation.

In the proposed consent decree, the parties stipulate "that the annexation of [the unincorporated areas within the 'solid blue line' on the attached map] would be fair, reasonable, in the interest of both sides and in furtherance of the objectives of the Voting Rights Act." The parties agree that this stipulation will assist Foley in gaining Justice Department approval for the proposed annexations, since Foley does intend to attempt to annex all of the areas within the blue line and wants to submit them all as a "package" to the Justice Department for preclearance.

There is a small area south of Highway 12 but within the solid blue line which would not be subject to the abbreviated annexation procedures of Areas 1 through 6 under the terms of the consent decree. This area, the "southerly tail," would be subject to the § 11–42–21 annexation requirements.

Some of the areas within this southerly tail are the subject of a pending state-court lawsuit between Foley and neighboring Gulf Shores. Foley has attempted to annex these areas, and Gulf Shores has challenged the annexations in the Circuit Court of Baldwin County, Alabama. Among Gulf Shores's contentions in that case is that Foley's attempted annexations of areas in the southerly tail violated Alabama annexation statutes, which require that a territory be "contiguous to the boundary of and form a homogeneous part of the [annexing] city or town." *See* 1975 Alabama Code § 11–42–2(10) (Michie 1989).

## II.

### A. *Intervention as of Right*

■ Gulf Shores has moved to intervene in this action as of right, under Rule 24(a)(2) of the Federal Rules of Civil Procedure.[1] Under Rule 24(a)(2), a party seeking to intervene as a matter of right must meet the following requirements: (1) the application must be timely; (2) the interest asserted must relate to the property or transaction that is the subject of the action; (3) the applicant must be situated such that disposition of the action may impede or impair the applicant's ability to protect that interest; and (4) the interest asserted must be represented inadequately by the existing parties to the lawsuit. *Chiles v. Thornburgh*, 865 F.2d 1197, 1213 (11th Cir.1989). If these four requirements are all met, intervention must be granted. *Id.* at 1213; *see also ManaSota–88, Inc. v. Tidwell*, 896 F.2d 1318, 1321 (11th Cir.1990).

Gulf Shores's motion for intervention was timely, as it was filed almost immediately after publication of the proposed consent decree, which provided the first formal notice that Areas 3 and 4 and the southerly tail would be part of the parties' remedial plan.

■ Gulf Shores does not, however, meet the interest or impairment of interest tests under Rule 24(a)(2). In order to support a claim for intervention, Gulf Shores would have to show a " 'direct, substantial, legally protectible interest in the proceeding.' " *Chiles*, 865 F.2d at 1213 (citing *Athens Lumber Co. v. Federal Election Comm'n*, 690

---

1. Rule 24(a)(2) provides:

 "Upon timely application anyone shall be permitted to intervene in an action: ... (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties."

F.2d 1364, 1366 (11th Cir.1982)). This is not itself a rigid or technical standard; rather, the court's inquiry is a flexible one, which focuses on the particular facts and circumstances surrounding each application. *United States v. Perry County Bd. of Ed.*, 567 F.2d 277, 279 (5th Cir.1978).[2]

■ Gulf Shores first claims that it has an interest in the areas within the southerly tail that are currently the subject of state-court litigation between Foley and Gulf Shores. Gulf Shores further contends that that interest would be impaired by approval of the consent decree. According to Gulf Shores, the "proposed Consent Order would address substantive issues being litigated in the Baldwin County Circuit Court [regarding areas within the southerly tail] and would make findings adverse to Gulf Shores based solely on the stipulation of the plaintiffs and the City of Foley."

The court finds no merit in this claim. First, whether Gulf Shores has a "legally protectible" interest in the areas within the southerly tail is itself at issue in the state court case. This court need not reach the issue of Gulf Shores's interest, however, because if an interest exists, it would not be harmed. Entry of the consent decree would have no *res judicata* or *stare decisis* effect on the state court case. This court takes, and will take, no position on whether Foley's annexations of property within the southerly tail were legal under Alabama annexation law. Nor does the proposed consent decree address this issue. Regardless of any action of this court in disposing of the instant litigation, the Circuit Court could find that Foley's annexations of the areas in the southerly tail violated Alabama annexation law and are therefore void. In fact, the proposed consent decree does not apply to the areas within the southerly tail at all except to the extent that it stipulates that Foley's annexation of that area would not violate the Voting Rights Act. This stipulation is only relevant to obtaining preclearance of annexations of areas in the southerly tail. Gulf Shores has claimed no

interest in whether the Justice Department approves these annexations.

■ Gulf Shores further claims that the proposed consent decree's provisions affecting Areas 3 and 4 could have an effect on its position in the state court litigation because, with the addition of these two areas, Foley and the southerly tail would arguably meet the contiguity and homogeneity requirements of the Alabama annexation statute. *See* 1975 Alabama Code § 11–42–2(10). But this is hardly a basis for intervention, since any harm to their claimed interest is speculative and contingent. *See ManaSota–88 v. Tidwell*, 896 F.2d 1318, 1322 (11th Cir.1990). Gulf Shores's claim is essentially this: if the consent decree is approved, and if Areas 3 and 4 in fact choose annexation, and if Foley would have been unable to annex these areas in the absence of the consent decree, and if the state court considers the changed Foley boundaries to be dispositive in determining whether prior annexations in the southerly tail were legitimate under state law, then the proposed consent decree would have had an effect on the state court litigation. The effect is not direct, however, and it depends on a number of factual variables unrelated to the instant litigation.

Even if the likelihood that this scenario would play out in its entirety neared 100%, Gulf Shores could not claim a sufficient interest in Areas 3 and 4 to justify intervention. The status of Areas 3 and 4 is not at issue in the state court case. Whether or not they are part of Foley is only relevant as evidence of the legality of Foley's claim to areas within the southerly tail. While the court can certainly understand Gulf Shores's desire to make this evidence as helpful to their case as possible, this court cannot permit Gulf Shores to intervene in an unrelated litigation only to protect that evidence.

■ Gulf Shores also claims an interest in areas within its police jurisdiction that could be affected by implementation of the proposed consent decree. First, it claims that Foley's annexation of Areas 3 and 4 would compress the existing police jurisdiction of

2. In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Gulf Shores. This fact has been disputed by the parties. At a minimum, it appears that Foley's annexation of Areas 3 and 4 would change the equidistant boundary between Foley and Gulf Shores that determines which city can collect taxes and license fees in an area of overlapping police jurisdiction. *See* 1975 Alabama Code §§ 11–40–10 (Michie 1989), 11–51–91 (Michie 1994). Gulf Shores further claims that a compression would have "a direct impact on that city's law enforcement and revenue collection powers." However, *Gulf Shores has made no showing of economic loss or increased municipal obligation relating to a change in its police jurisdiction or equidistant boundary. Gulf Shores has not offered any evidence of anticipated loss in tax revenues or license fees that might result from a change in boundaries,* much less a substantial loss. Gulf Shores *has not shown that the consent decree would impede a "direct" or "substantial" interest in the area within its police jurisdiction area.*

■ Lastly, Gulf Shores claims a general interest in the enforcement of Alabama annexation law. However, this interest is shared by all citizens and municipalities of Alabama concerned about the policies and procedures of annexation and is too generalized to support a claim for intervention as of right. *See Athens Lumber,* 690 F.2d at 1366.

### B. Permissive Intervention

■ This court also declines to grant Gulf Shores's motion for permissive intervention pursuant to Rule 24(b)(2) of the Federal Rules of Civil Procedure.[3] In assessing a motion for permissive intervention, the court must consider the effect of intervention on the existing parties and its potential to delay the progress of the case. Fed.R.Civ.P. 24(b); *see Stallworth v. Monsanto Co.,* 558 F.2d 257, 265 (5th Cir.1977). *Granting intervention in this case and at this time would clearly interfere with its rapid disposition,* and it is not warranted by the circumstances. Gulf Shores has no interest in the resolution

of the voting rights dispute between the existing parties and its intervention would not contribute in any way to judicial economy.

Lastly, it is important to emphasize that although the court will not grant Gulf Shores's motion for intervention, it has carefully considered the merits of its objection to the proposed consent decree. Although Gulf Shores is not a party to this action, its attorneys were afforded the opportunity to have both its motion for intervention and its objection heard during oral argument and through the submission of briefs.

### C. Approval of the Consent Decree

■ The proposed consent decree in this case would require and facilitate the implementation of a race-neutral annexation policy for the City of Foley. Under the consent decree, the majority-black areas of Beulah Heights and Mills Quarters would have the opportunity to choose annexation to Foley, potentially providing them with needed city services and support. Other surrounding areas, some of whose annexations have been blocked by the Department of Justice in the past, would also have the opportunity to choose annexation under the same terms and conditions as the two majority-black areas. African–Americans living in West Mills (Area 7 on the attached map) would also benefit from the consent decree. Although Foley would not formally annex that area because it is not contiguous to the city's current or proposed boundaries, the city would provide it with essential water services.

#### 1. Standard of Review

■ It is well-settled that judicial policy favors voluntary settlement for resolution of class-action as well as other cases. *Cotton v. Hinton,* 559 F.2d 1326, 1331 (5th Cir.1977). It is also established, however, that courts must independently evaluate class-action settlements for fairness, adequacy, and reasonableness, since the settlement process may be subject to abuse. *Piambino v. Bailey,* 757 F.2d 1112, 1139 (11th Cir.1985), *cert.*

---

**3.** Rule 24(b) provides in part:
"Upon timely application anyone may be permitted to intervene in an action: ... (2) when an applicant's claim or defense and the main action have a question of law or fact in com-

mon.... In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties."

*denied,* 476 U.S. 1169, 106 S.Ct. 2889, 90 L.Ed.2d 976 (1986); *Pettway v. American Cast Iron Pipe Co.,* 576 F.2d 1157, 1169 (5th Cir.1978), *cert. denied,* 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979). Lastly, because a consent decree may invoke the court's power to do what the parties alone do not have the authority to do, the court must ensure that the proposed decree is not illegal or against public policy, *United States v. City of Alexandria,* 614 F.2d 1358, 1362 (5th Cir. 1980); *White v. State of Alabama,* 867 F.Supp. 1519, 1533 (M.D.Ala.1994).

### 2. Fairness, Adequacy, and Reasonableness

■ In determining whether a proposed settlement is fair, adequate, and reasonable, a court may examine the following factors: (1) the views of the class members; (2) the views of class counsel; (3) the substance and amount of opposition to the settlement; (4) the possible existence of collusion behind the settlement; (5) the stage of the proceedings; (6) the likelihood of success at trial; (7) the complexity, expense, and likely duration of the lawsuit; and (8) the range of possible recovery. *White v. State of Alabama,* 867 F.Supp. at 1533. *See Leverso v. SouthTrust Bank of Alabama, Nat. Assoc.,* 18 F.3d 1527, 1530 n. 6 (11th Cir.1994); *Bennett v. Behring Corp.,* 737 F.2d 982, 986 (11th Cir.1984).

■ Before examining the views of a class regarding a proposed settlement, the court should ensure that class members have been given notice of the settlement, as required by Rule 23(e) of the Federal Rules of Civil Procedure. Adequate notice was given to class members, as described above, and a fairness hearing was held.

■ Noting that there have been no objections from individuals who identified themselves as class members and that there is no apparent conflict of interest in the class, the court assumes that the plaintiff class overwhelmingly supports the proposed consent decree. *Cf. Reynolds v. King,* 790 F.Supp. 1101, 1109 (M.D.Ala.1990) (majority's silence may be, but is not always, indicative of class-wide support). The court finds that the plaintiff class favorably views the proposed settlement.

In considering the fairness, adequacy, and reasonableness of a proposed settlement, a court should also consider the views of class counsel. *Pettway,* 576 F.2d at 1215. Class counsel for the plaintiffs are experienced civil rights and voting rights lawyers who have shown to the court, through their long-term participation in this and related cases and through their continued monitoring, an enduring commitment to protecting the voting rights of the plaintiff class. Class counsel have argued that the proposed settlement is fair, adequate and reasonable, and the court gives considerable weight to their views. *See White v. State of Alabama,* 867 F.Supp. at 1535.

Even outside of the plaintiff class, opposition to the proposed settlement has been extremely limited. The court received only two objections. One, from the City of Gulf Shores, has been discussed above and its merits are fully considered below in the court's discussion of the proposed settlement's legality. The other objection, from landowners living in Area 2, was withdrawn shortly after the fairness hearing was held and then "reactivated" more than a month later. No objection was registered challenging the fairness, adequacy, or reasonableness of the proposed settlement for the plaintiff class.

■ Collusion can exist when the named plaintiffs or class counsel benefit from a proposed settlement at the expense of the rest of class, *see, e.g., Holmes v. Continental Can Co.,* 706 F.2d 1144, 1147–48 (11th Cir.1983), or when the parties fail to engage in settlement negotiations as adversaries, *see White v. State of Alabama,* 867 F.Supp. at 1539. No objector has claimed that the proposed settlement is collusive, and the court has found no evidence of the same.

■ The other four factors—the stage of the proceedings, the likelihood of success at trial, the complexity, expense, and likely duration of the lawsuit, and the range of possible recovery—are interrelated. *Id.* at 1538. This phase of the *Dillard v. Foley* voting rights litigation regarding annexation policies has been underway for approximate-

ly a year. The settlement arose out of mediation talks conducted with a Magistrate Judge where parties were instructed to consider the expense of pursuing the litigation and the relative strengths and weaknesses of their cases. The attorneys involved are, as stated above, experienced voting rights attorneys who are familiar with the issues being litigated here. The Department of Justice, which has access to a large quantity of statistical information regarding Foley's annexation policies, has objected to several of Foley's annexation requests over the last six years on the basis of Foley's apparent racial selectivity and has blocked residential annexations since 1989. All of these factors combined indicate that legal and factual issues have been sufficiently identified and delineated that an early settlement would not be to the disadvantage of the parties.

Further, it has been stipulated by the parties that the plaintiffs' evidence has established a prima facie case of Foley's violation of § 2 of the Voting Rights Act and the United States Constitution. Although this stipulation does not guarantee that the plaintiffs would prevail at trial, since Foley has indicated that if the case went to trial it would vigorously rebut the plaintiffs' evidence, it indicates at least a likelihood that plaintiffs would prevail but only after a difficult, expensive, and contentious struggle.

Although the court cannot predict the outcome of the litigation if it went to trial, it should consider whether a proposed settlement falls within a reasonable range of possible recovery. The plaintiffs' motion reopening this litigation requests a court order requiring Foley to adopt and implement a permanent nondiscriminatory annexation policy and to take immediate steps to seek preclearance under § 5 and to annex Mills Quarters and Beulah Heights. The relief provided for in the consent decree would fall short of that request in only one respect: it would provide for referenda on the annexation of Mills Quarters and Beulah Heights, rather than outright, court-ordered annexation. This modification should not substantially impair the benefit to the plaintiffs. In terms of the referendum requirement for Areas 1 and 5, it is unlikely that a genuine majority interest in annexation would fail to be reflected in such a vote. The settlement prohibits Foley from taking any action to discourage residents from voting for annexation, and it is not in Foley's interest to do so, because the disposition of Foley's preclearance applications for other areas might be affected by a negative outcome of the referenda or by any evidence of official or unofficial discouragement of annexation. It is also reasonable that Beulah Heights and Mills Quarters residents be asked to affirm their interest in annexation by voting for it in formal referenda. In terms of the proposed settlement's granting white-majority areas the same special annexation procedure, this does not really deviate from the plaintiffs' original request because it too would further the goal of a non-racially-selective annexation policy. Moreover, resulting annexations will still be subject to § 5 preclearance by the Justice Department, which will require an in-depth assessment prior to granting preclearance to ensure that the annexations do not unfairly dilute the voting strength of Foley's African–American voters.

The proposed settlement would provide yet another benefit to the plaintiffs, as it would provide much-needed city sewage services to West Mills, a majority-black community that cannot reasonably be annexed to Foley. This would benefit additional class members who live outside of Foley, Mills Quarters, and Beulah Heights. It is unlikely that relief gained through a lengthy trial would be significantly better for the plaintiffs.

 Based on all of the above factors, it is the court's independent evaluation that the proposed settlement will benefit African–Americans living in and around Foley. The court realizes that there is no guarantee that Beulah Heights and Mills Quarters will, in fact, be annexed under this settlement, but it finds that the likelihood is strong and the procedure is fair.

### 3. The Legality of the Proposed Settlement

 Gulf Shores's objection contends that the settlement is illegal as an unnecessary interference with state authority. The court disagrees and concludes that the pro-

posed consent decree is legal and good public policy.

■ It is undisputed that the proposed settlement provides a procedure for annexation of Areas 1 through 6 that would be impermissible under state law. Under state law, there are three methods by which a municipality may annex adjoining territory. First, annexation can be effected by a special legislative act of the legislature. Second, annexation can occur pursuant to 1975 Alabama Code § 11–42–21 (Michie 1989) when all of the landowners in the area to be annexed submit a petition for annexation and the city council adopts an ordinance approving the annexation. Third, annexation of land that is "contiguous" to and that forms "a homogeneous part" of the city can occur pursuant to 1975 Alabama Code § 11–42–2 (Michie 1989), which sets out a three-step process. In the first step, an annexation petition must be submitted to the city council signed by (a) the owners of at least 60% of the land to be annexed and (b) at least two qualified voters from "each quarter of each quarter section" included in the petition. The city council then votes on an approving resolution. Finally, the annexation is put up to a referendum where a majority of residents who are eligible voters must approve the annexation.

The effect of the proposed consent decree would be to dispense with the petition requirement for those properties that do not "qualify" for the unanimous petition method. If any or all of Areas 1 through 6 did not qualify for the unanimous petition method, that area would be permitted to jump immediately to the referendum stage; if a majority of eligible voters cast their referendum ballots for annexation, the annexation would immediately be entered as an order of the Baldwin County Judge of Probate.

■ The court has the authority to approve a settlement that modifies state law. Federal courts have broad power to remedy violations of the federal Constitution, see, e.g., Missouri v. Jenkins, 495 U.S. 33, 57, 110 S.Ct. 1651, 1666, 109 L.Ed.2d 31 (1990) (approving federal court's order for state to increase taxes above state-mandated limit to remedy violation of the fourteenth amend-

ment) and of Voting Rights Act violations, see, e.g., Dillard v. Crenshaw County, 831 F.2d 246, 248 (11th Cir.1987) (approving district court's order modifying election scheme for county commission).

■ The relief a court can provide through approving a proposed settlement is at least as broad as the relief it can award after trial, Local Number 93, International Assoc. of Firefighters, AFL–CIO, C.L.C. v. City of Cleveland, 478 U.S. 501, 525, 106 S.Ct. 3063, 3077, 92 L.Ed.2d 405 (1986), and consent decrees, like other judgments, can be used to modify state law, see White v. State of Alabama, 867 F.Supp. 1519 (approving consent decree that changed state's system for electing appellate judges); see, e.g. Armstrong v. Adams, 869 F.2d 410, 414 (8th Cir.1989) (affirming district court's approval of consent decree requiring holding of special election on issue of banning alcohol); Dillard v. Crenshaw County, 831 F.2d at 248 (approving consent decree modifying method of electing county commissioners).

■ However, in determining whether the court should put its considerable equitable powers behind a proposed consent decree, the court must be governed by the principle of federal-state comity. This involves the court giving proper respect and consideration to the integrity and function of local government institutions, Missouri v. Jenkins, 495 U.S. at 52, 110 S.Ct. at 1663, and, as in this case, "[w]hen devising election plans, ... defer[ring] to state legislative policy and modify[ing] the state's plan only to the extent necessary to cure statutory or constitutional defects," United States v. Dallas County Comm'n, 850 F.2d 1430, 1432 (11th Cir.1988), cert. denied, 490 U.S. 1030, 109 S.Ct. 1768, 104 L.Ed.2d 203 (1989).

The proposed consent decree clearly meets the burden posed by Missouri v. Jenkins, since it was agreed to by the City of Foley and respects the city's role in setting its own boundaries. This court must also weigh whether the decree appropriately defers to state legislative policy, since in this case Foley's interests and the state's enacted policy, which requires landowners to petition before an area's voters may choose annexation, may

not be the same. It should be noted here that the state has not interposed any objections to the proposed settlement.

As stated above, the proposed consent decree would violate state law to the extent that it dispenses with the annexation petition requirements in Areas 1, 1A, 2, 3, 4, 5, and 6. One of the two objections to this scheme, interposed by Gulf Shores, concedes that it is appropriate for this court to dispense with the state law petition requirement in Areas 1 and 5 (Mills Quarters and Beulah Heights) because this would be minimally intrusive to state law and tailored to remedy the harm claimed by the plaintiffs—i.e., that class members have been deprived of the equal opportunity for annexation to Foley. Elimination of the petition requirement in these areas would not totally disregard the procedure preferred by the Alabama legislature, but would merely modify it to ensure that annexation, if desired by a majority of eligible voters, would be speedily accomplished and not subject to the delay and corruption that the petition requirement may have previously engendered in Areas 1 and 5.

■■■ Gulf Shores objects, however, to the inclusion of the additional majority-white areas in the consent decree's remedial scheme as an unnecessary further intrusion on state policy. The court accepts that eliminating the petition requirement for Areas 1 and 5 only would involve a more limited intrusion into state law. However, comity is not the only principle by which the court must abide in assessing a remedy for a presumptive voting rights violation. The court must also ensure that a remedy, carefully designed to limit its intrusion upon state law, not contain other statutory or constitutional defects. In this case, the court must ensure that a proposed remedy not be unconstitutionally race-based.

Permitting the modification of state annexation law for Areas 1 and 5 only would constitute a race-based remedy that would trigger strict-scrutiny analysis. Although such a proposal is not facially race-based, the special treatment of Areas 1 and 5 would be "'unexplainable other than by race,'" *Shaw v. Reno*, 509 U.S. 630, 643, 113 S.Ct. 2816, 2825, 125 L.Ed.2d 511 (1993) (quoting *Ar-lington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977)), since these areas were identified by all parties on the basis of the race of their residents.

■■■ The Supreme Court recently ruled that "all racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny." *Adarand Constructors, Inc. v. Pena*, — U.S. —, —, 115 S.Ct. 2097, 2113, 132 L.Ed.2d 158 (1995). This standard applies to remedial measures that are intended to benefit a traditionally discriminated-against race, *see id.* at —, 115 S.Ct. at 2112, such as the one contemplated above. A court applying strict scrutiny must determine whether a race-based measure is "necessary to further a compelling interest," *id.* at —, 115 S.Ct. at 2117, and "narrowly tailored," *id.* Among the factors considered to determine whether this test has been met is the necessity of the relief and the "efficacy of alternative remedies." *United States v. Paradise*, 480 U.S. 149, 171, 107 S.Ct. 1053, 1066, 94 L.Ed.2d 203 (1987).

A race-based remedy is not "necessary" here. There is an efficacious, non-race-based policy that would remedy the discrimination complained of in the plaintiffs' motion for further relief, and this is the proposed settlement offered by the parties here. This settlement would eliminate many of the barriers, formal and informal, to annexation of Areas 1 and 5. It would treat equally other areas that have sought annexation or been sought for annexation by Foley and that have been beyond Foley's reach due, at least in part, to its failure to gain preclearance for annexations until it remedied or rebutted the government's finding of a discriminatory annexation policy.

■■■ The parties have, in effect, painted the court into a constitutional corner. On one side is an adequate, reasonable, and fair settlement between the parties that prevents a costly, delaying litigation with little hope that either party will win a more beneficial settlement. On another side is the legal principle of federal-state comity, which re-

quires the court to defer to state policy judgments and to modify state law "only to the extent necessary to cure statutory or constitutional defects," *Dallas County Comm'n,* 850 F.2d at 1432. And the court is constrained on yet another side by the dictates of the equal protection clause of the fourteenth amendment, which considers any race-based preferential policy "suspect" and requires that they be "necessary" to meet a "compelling" government interest.

The parties have shown that the proposed consent decree's modification of state law is limited to the extent necessary to cure the original harm, a racially-selective annexation policy, and to avoid another constitutional defect, an "unnecessary" race-based remedy. Further, the intrusion is of limited duration, since the elimination of the petition requirement would permit a one-time special procedure for the designated areas only. And it appears to have generated very little opposition from class and non-class members.

■ For many of the reasons discussed above, the court finds that approving this consent decree would be good public policy. It would resolve, without need for expensive litigation, a complex and far-reaching discrimination claim. It would provide Foley voters and residents with certainty regarding their voting and residency status that has been missing since 1989. And it would ensure the provision of rudimentary sanitation services to an area that has been, and would otherwise likely be, deprived of them.

■ Gulf Shores contends that the court must finally consider whether the effect of the decree on third parties is unreasonable or proscribed. *See United States v. City of Miami,* 664 F.2d 435, 440–441 (5th Cir.1981) (Unit B) (en banc plurality).[4] To the extent that such issues are before the court at this time, the court finds that the effect of the decree on third parties is neither. The only nonparties who may be directly affected by the consent decree are landowners in Areas 1 through 6 whose opposition to annexation would previously have prevented annexation under the petition requirement of Alabama annexation law. Under the consent decree, the landowners would only be permitted to cast a vote in the annexation referenda like other area residents. Two landowners in Area 2, John and Margaret Krupinski, have objected to entry of the consent decree on that very basis.

Nonetheless, and having carefully considered the merits of the Krupinskis' objection, the court finds that such an effect is neither unreasonable under the circumstances, where the establishment of a fair, non-discriminatory annexation policy hangs in the balance, nor, for the reasons discussed above, proscribed.

Lastly, Gulf Shores contends that non-resident landowners whose rights might be affected by the consent decree have not been given adequate notice to meet the commands of the Due Process Clause, since notice was publicized only locally. The court is not in a position to evaluate such a claim at this point. The court has no idea whether such non-resident landowners exist, much less whether or not they received, or constructively received, adequate notice of the consent decree and of their opportunity to object. If such a landowner later challenges this decree collaterally, the issue of notice could be revisited at that time.

### III.

In summary, the proposed consent decree provides an effective method to provide African–American residents of Foley and surrounding areas the opportunity to participate fully in local politics and to choose to become city residents if they so desire. It does so without the need for race preferences. It constitutes a limited intrusion on state law. And it has gained the support of the plaintiffs and the City of Foley. For all of these reasons, the court concludes that it should approve the proposed judgment.

Accordingly, for the above reasons, it is the ORDER, JUDGMENT and DECREE of the court that:

---

4. In *Stein v. Reynolds Securities, Inc.,* 667 F.2d 33, 34 (11th Cir.1982), the Eleventh Circuit adopted as binding precedent all of the post- September 30, 1981 decisions of Unit B of the former Fifth Circuit.

(1) The motion to intervene, filed by the City of Gulf Shores on August 29, 1995, is denied.

(2) The objection, filed by Gulf Shores on August 29, 1995, is overruled.

(3) The objection, filed by John and Margaret Krupinski on August 25, 1995, withdrawn on September 12, 1995, and reinstated on October 23, 1995, is overruled.

(4) The joint motion to approve the proposed compromise and settlement, filed by the parties on July 26, 1995, is granted, and the proposed compromise and settlement is approved.

(5) The motion for further relief, filed by the plaintiffs on September 27, 1995, is denied as moot.

It is further ORDERED that costs are taxed against defendant City of Foley, for which execution may issue.

## APPENDIX

### CONSENT DECREE

Plaintiffs have moved this Court for further relief against defendant City of Foley, Alabama ("City"). The parties are desirous of resolving this matter without the need for time consuming, costly litigation. Accordingly, they have entered into the following stipulation upon which this decree is based.

### Stipulation of the Parties

1. On May 16, 1989, this Court entered an Order declaring that the at-large method of electing the city council in Foley, Alabama violates Section 2 of the Voting Rights Act, 42 U.S.C.1973.

2. Thereafter, defendant adopted and implemented a new election plan for the city council. As a result, defendant is governed today by a mayor-council form of government, consisting of a mayor and five council members, elected from single-member districts in nonpartisan elections. The new method of election received the requisite preclearance under Section 5 of the Voting Rights Act, 42 U.S.C.1973c, on November 6, 1989.

3. Under Alabama law, defendant has the authority to expand its municipal boundaries by annexing territory adjacent or contiguous to the City.

4. Between 1975 and 1987, the City on several occasions annexed territory into the City. City officials did not make a timely submission of the voting changes occasioned by twelve of these annexations to the Attorney General for preclearance, as required by Section 5 of the Voting Rights Act, 42 U.S.C. 1973c.

5. In 1989, the City submitted the twelve annexations to the Attorney General for preclearance. Nine of these annexations were precleared by the Attorney General because there was no population or planned residential use for those parcels. As to the remaining three (Ordinance No. 324–83, as amended by Ordinance No. 331–84; Ordinance No. 344–84; and Alabama Acts 86–489 and 86–549), however, the Attorney General interposed an objection to the annexations. In the letter of objection dated November 6, 1989, the Attorney General stated that there was a concentration of black population contiguous to the City's northwestern boundary (known as Mills Quarters) and that certain residents of this Mills Quarters area unsuccessfully had sought annexation. The objection letter further noted that these black residents of the portion of the Mills Quarters area contiguous to the City had been discouraged from seeking annexation and eventually their annexation efforts were rejected. The Attorney General's objection letter further observed that the City facilitated efforts by certain predominantly white areas to become annexed into City and that the City had not sustained its burden of showing nonracial reasons for rejection of the Mills Quarters petition.

6. The City contends that it denied annexation requests from what it describes as two white areas—Amelia Woods and Bon Secour/Huggers Landing—at the time the Mills Quarters' request for annexation was rejected.

7. After 1987, Foley continued to expand its boundaries through annexation. Three of these annexations—in 1989 (Ordinance No. 417–89), 1992 (Ordinance No. 464–92) and 1993 (Ordinance No. 473–93)—involved prop-

erties which were for commercial or public school development only. A fourth annexation (Ordinance No. 472–93), also in 1993, was submitted to but not precleared by the Attorney General. The annexation which was not precleared was uninhabited farmland contiguous to the eastern boundary of the City which was proposed for residential development. This annexation ordinance was adopted by the City on March 1, 1993, and submitted to the Attorney General for Section 5 preclearance on March 19, 1993.

8. On August 30, 1993, the Attorney General interposed an objection to this annexation. The objection letter stated that "[o]ur analysis of the submitted annexation reveals that it, like the annexations objected to in 1989, reflects a continuation of the city's previously noted practice of annexing areas that can be expected to contain predominantly white population, while discouraging the annexation of areas of predominantly black population."

9. Accordingly, the property subject to Ordinance No. 472–93 which was not precleared by the Attorney General was deannexed from Foley by ordinance of the City on September 29, 1993.

10. In addition to the portion of Mills Quarters which is contiguous to the northwestern boundary of the City, there is one other concentration of black population contiguous to the city's corporate limits. This is an area known as Beulah Heights, which is contiguous to the City's eastern boundary. The western portion of Beulah Heights is already within the city limits, having been annexed in the 1960's. The plaintiffs contend that the eastern portion of Beulah Heights which is now located outside the city limits petitioned for annexation into Foley in January, 1995. The City contends that no such petition has ever been filed.

11. Nevertheless, the plaintiffs allege that a majority of the residents of the Mills Quarters and Beulah Heights areas which are contiguous to the City desire to be annexed into the City.

12. The plaintiffs contend that the City has applied disparate and more difficult standards for annexation of geographic areas wherein black citizens reside than the standards applied to geographic areas wherein white citizens reside or will reside. They contend that, as a result of the City's annexation standards, practices and procedures, black citizens living in the portion of Mills Quarters and Beulah Heights which are contiguous to the City of Foley, have been left outside the City's boundaries and that they are denied the right to vote in municipal elections.

13. The City denies the plaintiffs' allegations and contends that its annexation standards, practices and procedures have been adopted and applied in a non-discriminatory manner and without regard to racial factors or considerations. The City submits that it has ample evidence of its non-discriminatory policies. The plaintiffs, on the other hand, submit that they have ample evidence of the City's discriminatory annexation policies and that this evidence establishes a violation of federal law as alleged in the Motion for Further Relief. Accordingly, both parties recognize the desirability of resolving this dispute and agree to this Consent Decree in order to compromise and settle the claims of liability between them.

14. The map attached hereto as Exhibit A is of the City of Foley and its surrounding vicinity. The black dotted line represents the current corporate limits of the City. The solid blue line represents the proposed corporate limits for the City. The Area shaded in red and marked Area 1 represents the portion of the Mills Quarters community contiguous to the current corporate limits and referenced above. The Area shaded in red and marked Area 5 represents the Beulah Heights community referenced above. The other designated Areas within the solid blue line but outside the current corporate limits are marked Areas 1A, 2, 3, 4 and 6. Each of the areas is described by metes and bounds on the map.

15. The parties agree that all of the properties within the solid blue line—including, but not limited to, designated Areas 1–6—should be annexed into the City. The parties further agree that the annexation of such properties would be fair, reasonable, in the

interest of both sides and in furtherance of the objectives of the Voting Rights Act.

16. Some of the properties may be annexed pursuant to the unanimous consent method outlined in *Ala.Code* (1975), § 11–42–21. Those properties not qualifying for the unanimous consent method may be annexed pursuant to referenda as set forth herein. Separate referenda shall be held for each of the Areas 1 through 6 (including Area 1A) depicted on the attached map. All of the properties in each area which do not qualify for the unanimous consent method of annexation shall be subject to a referendum. The City, and all officials and employees thereof, shall not take any action to discourage residents of Mills Quarters and Beulah Heights from voting in favor of the annexation. Indeed, the City is desirous of annexing all of the areas within the solid blue line and agrees to encourage residents of these areas to support the annexation referenda as being in the best interests of the residents therein and the City.

17. A negative vote on annexation in any of the areas in question shall not defeat or diminish the parties' stipulation or the Court's finding that this effort to pursue annexation of the Areas in question, regardless of the referendum outcome and whether the areas are actually annexed or not, resolves all issues between the parties and satisfies the objectives of the Voting Rights Act.

18. The City has obtained the assurances of the Utilities Board of the City of Foley (a separate public corporation and non-party to this action) to construct a water system which will provide water service to Areas 1 and 5 (Mills Quarters and Beulah Heights) and to Area 7 depicted on the attached map (shaded in green) (which area will not be annexed into the City) in accordance with the engineering set forth on the diagram attached hereto as Exhibit B. The City has applied for a $250,000 grant from ADECA to assist in the providing of this water service. If the grant is awarded, there will be no water service connection fees for the eligible residents of these areas at the time of original construction. If the residents do not apply for and obtain water at the time of original construction, but rather wait until some later date, then the regular connection fees will be charged to those applying at a later date. ("Connection fee" is defined as that fee charged by the Utilities Board to the customer for connecting the main distribution line to the meter on the customer's property. It does not include the cost of connecting the line at the meter to the dwelling or building of the customer.) The cost of connecting the meter to the dwelling or building is a private plumbing cost which must be borne by each customer. In addition, each customer will be required to pay the regular security deposit upon obtaining water service.

If the grant application is not successful, then the City will make the necessary financial arrangements with the Utilities Board to insure that the connection fee for the residents of Areas 1, 5 and 7 will be $100 each at the time of original construction. Those persons in these areas hooking on to the system at some later date will have to pay the regular costs, including the standard connection fee.

19. With the exception of the water service specifically mentioned above, this stipulation and the Court's decree are not conditioned upon or subject to any agreement or undertaking by the City to provide any special services or special improvements to any of the areas being annexed or to the surrounding vicinity. In particular, the paving of streets and the provision of sewer services in Areas 1 and 5 is not a condition of this decree. Of course, the City shall provide services and improvements to all areas within the corporate limits in accordance with regular City policies and procedures and without regard to the racial makeup of any particular area.

20. The voting changes occasioned by this agreement will be submitted to the Attorney General by the City of Foley for preclearance pursuant to Section 5 of the Voting Rights Act. Once preclearance is obtained, the City will undertake the action necessary to hold the annexation referenda contemplated by this agreement.

21. It is anticipated that after the City conducts the necessary referenda contemplated by this agreement, the City will submit to the Attorney General for preclearance pursuant to Section 5 of the Voting Rights Act: the proposed annexations within the solid blue line on the map attached as Exhibit A which were (i) annexed by affirmative majority vote in the referenda or (ii) were annexed by the unanimous consent method without referendum. It is the parties belief, and a condition of this settlement, that upon preclearance, the Attorney General will, in accordance with the parties' understanding of the standard operating procedure of the Department of Justice, issue a letter acknowledging that all previous objections to the City's annexations and its annexation policies are withdrawn and have been remedied by the implementation of this decree.

*Decree*

Accordingly, it is hereby ORDERED, ADJUDGED and DECREED as follows:

(a) The stipulations of the parties set forth above are adopted by the Court as its findings of fact.

(b) The Court recognizes that the plaintiffs' claim that defendant's annexation practices, policies, standards and procedures violated Sections 2 and 5 of the Voting Rights Act, 42 U.S.C. §§ 1973 and 1973c, and the Fourteenth and Fifteenth Amendments to the United States Constitution, if proven and left unrebutted at trial, could establish a violation of federal law as alleged by the plaintiffs in their Motion for Further Relief. The Court also recognizes that the defendant denies the plaintiffs' allegations on the merits. Nevertheless, this Court has determined that this Consent Decree, and the relief afforded hereby, is consistent with, and indeed furthers, the objectives of the Voting Rights Act.

(c) Therefore, the Court finds that the annexations described in this decree are fair, reasonable, in the interest of both parties, in compliance with the provisions of the Voting Rights Act, and in furtherance of the objectives of the Voting Rights Act. These annexations also RESOLVE the claims set forth in plaintiffs' Motion for Further Relief dated September 26, 1994.

(d) In the future, the defendant shall not adopt or undertake any policy or practice regarding annexations which is racially discriminatory.

(e) Defendant shall take immediate steps to submit Areas 1 through 6 as depicted on the map attached hereto as Exhibit A to separate referenda for each area to determine whether or not each will be annexed into the City (but excluding from the referenda those properties within the blue line but not within any designated referendum area). In order to satisfy the objectives of the Voting Rights Act, the Court orders that Defendant shall hold the referenda without the necessity of a petition as described in *Ala. Code* (1975), § 11–42–2.

(f) If a majority of the voters in one or more of the areas subject to referenda vote for annexation, the Baldwin County Judge of Probate shall enter an order on the records of the court adjudging and decreeing that the corporate limits of the City shall be extended so as to embrace the territory covered by each such area registering an affirmative majority vote.

(g) Defendant shall, within thirty days after the annexations referred to in paragraph (f), above, are adopted, seek preclearance pursuant to Section 5 of the Voting Rights Act, 42 U.S.C.1973c, of the voting changes occasioned by the annexations of such areas and those other areas within the solid blue line annexed by the unanimous consent method. The plaintiffs shall at that time, as they have agreed to do, submit a written comment letter to the Attorney General urging him to grant Section 5 preclearance to such voting changes.

(h) A negative vote on annexation in any of the areas in question shall not defeat or diminish the Court's findings and decree in paragraphs (b) and (c) above.

(i) The Court retains jurisdiction of this matter at this time. If preclearance by the Attorney General as contemplated by this settlement is not obtained, this Court will forthwith set this case for another scheduling conference. Otherwise, upon preclearance by the Attorney General of the annexations

submitted by the City pursuant to this Consent Decree, the parties shall have thirty days from the date of the preclearance letter to reach agreement on the issues of attorneys' fees, litigation expenses, costs and final judgment. If no agreement is reached within those thirty days, the plaintiffs shall file their motion for attorneys' fees, litigation expenses, and costs in accordance with the provisions of Local Rule 20 of this Court. Defendant shall have thirty days to respond to plaintiffs' filings, and it specifically reserves the right in its responsive filing to seek leave of Court to take discovery on plaintiffs' request for attorneys' fees. If defendant is granted the right to take discovery on this issue, then plaintiffs shall have equal rights to discovery.

Ordered this 30th day of October, 1995.

/s/ Myron H. Thompson
United States District Judge

## ORDER ON MOTION FOR MODIFICATION

This lawsuit is before the court on a Rule 62(c) motion for modification of decree pending appeal filed by the City of Gulf Shores, W.D. Bolton, Sr., Margaret Krupinski and John Krupinski ("movants") on December 7, 1995. The consent decree was approved and entered by the court in orders on October 30, 1995. For the following reasons, the motion for modification is denied.

### I.

In its October 30 orders, the court approved and entered a consent decree settling a dispute between a class of African–American plaintiffs and the City of Foley regarding the city's annexation policies. The plaintiffs claimed that Foley's annexation policies were racially discriminatory, and Foley admitted that the plaintiffs could establish a prima facie violation of § 2 of the Voting Rights Act, 42 U.S.C.A. § 1973 (West 1994), and the fourteenth amendment to the United States Constitution.

Under the consent decree approved by the court, the parties agreed that Foley would establish a non-discriminatory annexation policy by holding referenda in seven areas surrounding Foley to determine whether the residents of those areas wanted to be annexed to the city. Two of those seven areas, designated Area 1 and Area 5, comprise primarily African–American residents who have been unable to be annexed to Foley in the past. The other five areas, designated Areas 1A, 2, 3, 4, and 6, comprise primarily white residents or are largely uninhabited. Under the consent decree, if a majority of voters in any or all of the areas agree to annexation, Foley will submit the voter-approved annexations for preclearance by the United States Department of Justice and, if precleared, Foley promises to annex the areas. The plaintiffs stipulated that if this procedure is followed they will agree that annexation of any or all of the surrounding areas does not violate the Voting Rights Act or the equal protection clause of the fourteenth amendment. A final judgment would then be entered. If preclearance by the Justice Department is not obtained, the case will proceed.

The annexation procedure outlined in the consent decree differs from that required under Alabama annexation law. Under 1975 Alabama Code § 11–42–2 (Michie 1989), annexation of those surrounding areas would require a petition for annexation signed by a certain proportion of landowners in those areas before referenda could be held.

Before approving the parties' settlement, the court ordered publication of the proposed consent decree, and it held a public fairness hearing on September 6, 1995, to consider objections from class and non-class members. All of the movants eventually registered objections to entry of the decree, which were overruled in the court's October 30 orders. All moved to intervene in the case, as well. The city of Gulf Shores is located several miles south of Foley and claimed that entry of the consent decree and annexation of Areas 3 and 4 would compress its police jurisdiction and affect its position in existing litigation between it and Foley. Bolton and the Krupinskis are landowners in Area 2 and claimed that entry of the consent decree and annexation of Area 2 would prevent them from exercising their state-law right to block annexation of their property. Gulf Shores's motion to intervene was denied in the court's October 30 order approving the consent decree, and the other movants' motion to intervene was denied in a later separate order. Notices of appeal on the approval of the consent decree, overruling of the movants' objections, and denial of intervention were filed by the movants on December 28, 1995 and January 4, 1996.

### II.

The movants seek to have the court modify the consent decree, pending appeal, so as to suspend or stay those provisions of the consent decree that would permit annexation without landowner petition in Areas 1A, 2, 3, 4, and 6. Under Rule 62(c) of the Federal Rules of Civil Procedure, the court in its discretion may, upon appeal from an interlocutory or final judgment granting, dissolving, or denying an injunction, "suspend, modify,

restore or grant an injunction during the pendency of the appeal." Fed.R.Civ.P. 62(c).

██ The parties first argue that Rule 62(c) is "not the appropriate vehicle for obtaining a stay of the consent decree," because the court's October 30 orders approving the consent decree do not constitute an interlocutory or final judgment granting an injunction. The court disagrees.

██ The parties appear to contend that the consent decree does not constitute an appealable injunction for purposes of Rule 62(c). The law does not provide a clear standard for identifying appealable injunctions. The form and scope of injunctions are prescribed in Federal Rule of Civil Procedure 65(d); however, not all orders that meet the requirements of Rule 65(d) are appealable, *see* 16 Charles A. Wright et al., Federal Practice and Procedure § 3922 (1977) (stating general rule that orders granting temporary restraining orders are not appealable as orders respecting injunctions), and some orders that do not comply with the formal requirements of Rule 65(d) have been found to be appealable injunctions, *see id.; see also Chicago & North Western Transportation Co. v. Railway Labor Executives' Association,* 908 F.2d 144, 149–50 (7th Cir.1990), *cert. denied,* 498 U.S. 1120, 111 S.Ct. 1073, 112 L.Ed.2d 1179 (1990) (holding that appealability relates to an order's enforceability, not its adherence to Rule 65(d)). Generally, appealable injunctions are "orders that are directed to a party, enforceable by contempt, and designed to accord or protect some or all of the substantive relief sought by a complaint in more than preliminary fashion." 16 Charles A. Wright, Arthur R. Miller, Edward H. Cooper, Eugene Gressman, Federal Practice and Procedure § 3922 (1977). Whether or not an order is "styled" an injunction, it is "the essential effect and character of an order, rather than the terminology applied to it" that is decisive. *Martinez v. Mathews,* 544 F.2d 1233, 1236 (5th Cir.1976).[1]

The parties rely on *Lucas v. Bolivar County,* 756 F.2d 1230 (5th Cir.1985), to support their argument that the consent decree submitted by them and signed by the court is not an appealable injunction. In that voting rights case, the Fifth Circuit found that an order entered by a district court "approving" a redistricting plan as lawful under the constitution and the Voting Rights Act, directing the parties to submit the plan to the Attorney General for preclearance, and retaining jurisdiction to enter further orders as appropriate to call special elections was not an appealable injunction. 756 F.2d at 1235. After the redistricting plan was precleared, the same court had issued a "final judgment" actually setting the elections and electoral procedures. *Id.* at 1232. The Fifth Circuit found that the first order "approving" the plan was merely advisory because it took no action on the requested relief, the establishment of new voting districts, and therefore did not constitute an injunction or a denial of an injunction, as the plaintiffs in that case asserted. *Id.* at 1235.

In citing *Lucas,* the parties seem to argue that the consent decree entered in this case is similarly insufficiently "injunctive" to support the movants' appeal and motion for stay pending appeal under Rule 62(c). In other words, the parties seem to view the consent decree as a mere "approval" of an annexation plan for Foley, and not as an injunction directing the parties to engage, or refrain from engaging, in specific behavior or actions. *Lucas* is clearly distinguishable from this case, however. Here, the consent decree is signed by the court and orders the defendant not only to submit voting changes resulting from the approved annexations to the Attorney General for preclearance within 30 days of the annexations being made, but also to refrain from adopting or undertaking any policy or practice regarding annexations which is racially discriminatory and to take immediate steps to submit Areas 1 through 6 to separate referenda on annexation. It also orders the plaintiffs to submit a written comment letter to the Attorney General urging her to grant preclearance of the approved

---

1. In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

annexations. The consent decree does not constitute mere "approval" of the parties' plan, but rather requires "a party to do or refrain from doing something that is an integral part of the very matter in litigation," *id.* at 1235 (citing 7B J. Moore et al., Moore's Federal Practice ch. 83, at JC–422 (1984)), that is, to establish a procedure for non-discriminatory annexations and take specified steps to implement it.

Admittedly, the court's orders establish only a procedure for determining areas to be annexed and do not require specific annexations. This distinction is without significance. In *Martinez v. Mathews,* the former Fifth Circuit held that a judicial order directing a procedure for electing an interim board of directors at a health clinic was an appealable injunction. 544 F.2d at 1235. Moreover, in this case, establishing a procedure and a policy against racially-selective annexation was the plaintiffs' original requested relief.

This court finds that the consent order is clearly directed at the parties, is sufficiently specific "such that those who must obey [it] will know what the court intends to require and what it means to forbid," as to be enforceable, *see Gunn v. University Committee to End War in Viet Nam,* 399 U.S. 383, 389, 90 S.Ct. 2013, 2017, 26 L.Ed.2d 684 (1970), and provides relief as requested in the plaintiffs' original complaint. Although the ultimate decision on whether the consent order constitutes an appealable injunction belongs with the Court of Appeals, this court will consider the movants' Rule 62(c) motion as properly before it for stay pending appeal of the court's approval and entry of the parties' consent decree.

The movants request a modification, or stay, pending appeal of only a limited portion of the consent decree. Specifically, they request a stay of those portions that would permit annexation of Areas 1A, 2, 3, 4, and 6 without the landowner petition generally required under state law. These are the only provisions to which the movants have ever registered any objection or argument.

This court cannot modify the consent decree so as to stay only those provisions of the consent decree to which the movants object. The purpose of Rule 62(c) is to allow district courts to retain jurisdiction over a case to maintain the status quo where equity requires it while the case is on appeal. *See Turner v. HMH Publishing Co.,* 328 F.2d 136 (5th Cir.1964). It is not designed to "restore jurisdiction to the district court to adjudicate anew the merits of the case after either party has invoked its right of appeal and jurisdiction has passed to an appellate court." *McClatchy Newspapers v. Central Valley Typographical Union No. 46,* 686 F.2d 731, 734 (9th Cir.), *cert. denied,* 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982).

Imposing a modification or partial stay for only certain affected Areas would not maintain the status quo; it would permit the implementation of annexation procedures only in majority African–American Areas and would delay the implementation in majority white Areas for an undetermined period. This would serve to modify the consent decree to conform to the substantive arguments already advanced by the movants and considered and rejected by the court. Indeed, the modification or partial stay requested by the movants would violate the very underpinning of the parties' agreement, which was to consider annexation of a group of Areas together as a package. A substantive modification of a decree is impermissible. "Courts are not permitted to modify settlement terms or in any manner to rewrite the agreement reached by the parties." *Holmes v. Continental Can Co.,* 706 F.2d 1144, 1160 (11th Cir.1983).

Lastly, before reaching the merits of the movants' request for modification or stay, the court must address the parties' contention that the movants may not seek a stay of the consent decree because they were denied intervention and are not parties to this suit. Because it is within the court's discretion to issue a stay of an order granting an injunction, and because the Court of Appeals may consider both the movants' appeals on intervention and on the merits of the consent order, this court will consider whether issuing a stay on the underlying consent decree

**1076**

is warranted. *See, e.g., Harris v. Pernsley,* 654 F.Supp. 1057 (E.D.Pa.1987) (considering motion for stay of an approved consent decree under Rule 62(c) filed by a rejected movant for intervention).

■■ A stay under Rule 62(c) is considered "extraordinary relief" for which the moving party bears a "heavy burden." *Winston–Salem/Forsyth County Bd. of Education v. Scott,* 404 U.S. 1221, 1231, 92 S.Ct. 1236, 1241, 31 L.Ed.2d 441 (Burger, C.J., in chambers) (1971). In determining whether to grant a stay pending resolution of an appeal, courts must examine the following factors: (1) whether the applicants have made a strong showing that they are likely to prevail; (2) whether the applicants will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies. *Hilton v. Braunskill,* 481 U.S. 770, 775–76, 107 S.Ct. 2113, 2119, 95 L.Ed.2d 724; *United States v. Bogle,* 855 F.2d 707, 708 (11th Cir.1988).

■■ In this case, the movants have not made a strong showing that they are likely to prevail on appeal. They intend to argue to the Court of Appeals that the court should have disapproved the consent decree because abrogation of state law in Areas 1A, 2, 3, 4, and 6 was not "necessary" to resolution of the plaintiffs' claim. They argue that the court should have required the case to go to trial. The movants' arguments fail to carry the heavy burden under *Hilton* for a number of reasons. First, the movants do not even address the likelihood of prevailing on their intervention appeal. This court denied intervention for Gulf Shores in its October 30 orders on the basis that the city did not have a sufficient interest in the case to support their motion. Gulf Shores has made no argument or showing that the Eleventh Circuit is likely to find otherwise. This court denied intervention for the other movants on timeliness grounds, and such a determination is reviewed on appeal by a deferential "abuse of discretion" standard. *United States v. Jefferson County,* 720 F.2d 1511 (11th Cir. 1983). The movants have not made any showing that they are likely to prevail on the intervention issue.

■ However, because the Eleventh Circuit is likely to consider the merits of the movants' appeal on the consent decree in conjunction with the intervention appeal, this court will also consider whether the movants are likely to prevail on the merits. The movants first argue that the consent decree constitutes a "tying arrangement" that would be an illegal business transaction under the Sherman Antitrust Act, 15 U.S.C.A. § 1 (West 1973 & Supp.1995). The Sherman Antitrust Act does not apply to arrangements like voting rights remedies that do not affect commerce. The movants cite no cases that use an analogy from antitrust law in voting rights or equal protection jurisprudence.

The movants also argue that the abrogation of state law was not "necessary." As the court explained in its opinion of October 30, 1995, this one-time variance from state law is necessary in order to treat "equally" all areas "that have sought annexation or been sought for annexation by Foley and that have been beyond Foley's reach due, at least in part, to its failure to gain preclearance for annexations until it remedied or rebutted the government's finding of a discriminatory annexation policy."

The court also considers whether the movants will suffer irreparable harm if the consent decree is not stayed pending appeal. A final judgment has yet to be entered, and annexation is hardly a foregone conclusion upon approval of the consent decree. Under the decree, annexation will only occur if a majority of voters living in Area 2 approve it and if the Department of Justice finds annexation to be consistent with the requirements of the Voting Rights Act. If the voters of Area 2 choose to remain outside of Foley's boundaries, the movants' concerns will be resolved.

The movants argue that if the annexation referenda are held as scheduled, movants Bolton and the Krupinskis, Area 2 landowners, will "be forced to resist annexation by engaging in expensive and time-consuming electioneering, with no method available for recoupment." This argument is not persuasive. The harm to the parties that would

result from issuance of a stay pending appeal would be much greater. If Foley annexes any Area pursuant to the consent decree, it will have to apply for preclearance and engage in redistricting before general elections are held in Foley in August. This will require careful adherence to a schedule involving Foley and the Department of Justice. Issuance of a stay followed by an Eleventh Circuit affirmance of the consent decree's approval would require rescheduling and the incursion of additional expenses to plan and conduct new referenda in Areas 1A, 2, 3, 4, and 6. It would also likely result in delaying Foley's general elections, which would involve additional expenses and voter uncertainty. A stay would also result in an irremediable delay in the provision of basic water service to class members in Area 7.

Lastly, and for many of the same reasons, the public interest lies in denial of the stay. The processes for resolving this longstanding race discrimination lawsuit are already underway, and issuance of a stay may result in unnecessary expense to cancel and then reinstate the annexation referenda and preclearance applications. Moreover, if there is a reversal of the court's orders approving and implementing the consent decree, Foley will be biggest financial loser, for it will have gone through the processes for naught. But that is a risk that Foley is apparently willing to take.

Therefore, and for the reasons discussed above, it is ORDERED that the joint motion for stay of the consent decree pending appeal, filed by Gulf Shores, W.D. Bolton, John Krupinski and Margaret Krupinski on December 7, 1995, is denied.